REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL

1   Edward W. Lukas (SBN 155214)
    HARRINGTON, FOXX, DUBROW
2   & CANTER, LLP
    333 South Hope Street, Suite 1000
3   Los Angeles, California 90071
    Telephone: (213) 489-3222
4   elukas@kfdclaw.com

5   Linda D. Mettes (*Pro Hac Vice*)
    Rebecca J. Cantor (*Pro Hac Vice*)
6   Kristin L. Murphy (*Pro Hac Vice*)
    Anita C. Marinelli (*Pro Hac Vice*)
7   BROOKS KUSHMAN P.C.
    1000 Town Center
8   Twenty-Second Floor
    Southfield, Michigan 48075
9   Telephone:  248-358-4400
    lmettes@brookskushman.com
10  rcantor@brookskushman.com

11  *Attorneys for Defendant*

12                  **UNITED STATES DISTRICT COURT**

13                  **CENTRAL DISTRICT OF CALIFORNIA**

14

15  MERCADO LATINO, INC. dba          Case No.  2:13-cv-01027-DDP-JEM
16  CONTINENTAL CANDLE
    COMPANY,                          **[PROPOSED] DEFENDANT INDIO**
17                                    **PRODUCTS, INC.'S STATEMENT**
          *Plaintiff,*                **OF UNCONTROVERTED FACTS**
18                                    **AND CONCLUSIONS OF LAW**
    v.                                **RELATING TO DEFENDANT'S**
19                                    **MOTION FOR SUMMARY**
    INDIO PRODUCTS, INC., a           **JUDGMENT**
20  California Corporation, and
    DOES 1 through 10, Inclusive,     *(Concurrently filed with Notice of Motion*
21                                    *and Motion)*
          *Defendant.*
22
                                      Judge: Hon. Dean D. Pregerson
23                                    Courtroom: 9C, Ninth Floor
24                                    Date: Monday, June 4, 2018
                                      Time: 10:00 AM
25

26

27

28

Defendant Indio Products, Inc. ("Indio") hereby submits the following Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Summary Judgment against Plaintiff Mercado Latino, Inc. dba Continental Candle Company ("Mercado"), pursuant to Local Rule 56-1.

## I.    STATEMENT OF UNCONTROVERTED FACTS

**A.    Procedural Background**

| # | Uncontroverted Fact | Source |
|---|---|---|
| **1.** | On February 12, 2013, Mercado sued Indio alleging copyright infringement, trade dress infringement and two claims under California state law. | **DN 1**. |
| **2.** | On June 12, 2013, the Court granted Indio's motion to dismiss Mercado's copyright claim finding "Indio's border artwork design is not . . . substantially similar to Mercado's design."  The Court found "Mercado's border design features five colors in roughly equal proportions, fairly large rectangles and semicircles in a symmetrical arrangement, and the name of the particular religious figure within the border itself.  Indio's design is primarily blue, contains a large number of irregular shapes laid out in a somewhat jumbled and asymmetrical pattern, contains a distinctive, inset image of a dove or angel at the top of the border, and does not incorporate any text." | **DN 25** at 6-7. |
| **3.** | The Court also found that "because the protected elements of Mercado's expression are not similar to Indio's expression, Mercado cannot state a viable copying claim." | **DN 25** at 6-7. |

| 4. | The Court found that "Plaintiff's own use of the term 'cathedral window shape'" evidences that "the bullet-type design is a widespread and longstanding staple of devotional iconography, to which Mercado can lay no copyright claim" and "the use of a 'bullet,' arched, or conical shape in a depiction of a religious icon [is not] in any way groundbreaking." | **DN 25** at 6. |
| --- | --- | --- |
| 5. | On June 21, 2013, with leave of the Court, Mercado filed its second amended complaint ("SAC"). | **DN 26** at ¶¶42-63. |
| 6. | Mercado appealed the Court's dismissal of the trade dress and trademark infringement claim.   The Ninth Circuit reversed and remanded the trade dress dismissal. Mercado did not appeal the dismissal of the copyright claim. | **DN 51**; **DN 59**; **DN 95** at 3. |
| 7. | After remand, Indio moved for judgment on the pleadings with respect to Mercado's SAC.  On April 11, 2017, the Court denied Indio's motion for judgment on the pleadings stating that while Mercado "need not make any showing or provide any evidence at the pleading stage," the veracity of the allegations remains to be seen." | **DN 80**; **DN 95** at 8-9. |

**B.**     **Prayer Candle Competitors**

**C.     The Plaintiff Mercado Latino**

**D.     Mercado's Purported Trade Dress Contentions**

| | | |
|---|---|---|
| **17.** | Mercado does not have a federal registration for any trade dress associated with the Sanctuary Series candles. | **Ex A-4** (Mercado Response to Indio RFA #20). |
| **18.** | This Court found that Mercado's "trade dress is best categorized as product design rather than packaging and therefore cannot be inherently distinctive." | **DN 95** at 8. |
| **19.** | Mercado's Asserted Trade Dress is defined in the SAC as "a candle in a clear cylindrical container that is approximately .25 x 2.25 x 8.0 inches in length, width, and height, filled with a solid single color wax, the clear cylindrical container has an opaque die-cut label with two opposite sides – a "'front' and 'back.' The front side | **DN 26** at ¶12. |

of the die-cut label has a silhouette outlined by a black border with a top portion that tapers together and forms a pointed tip that resembles a 'bullet' shape, with segments of shapes in varying and alternating sizes and colors, similar to a stained glass window. Placed over that label is a depiction of a saint or other religious icon. Directly beneath the depiction of the saint or religious icon, is a separate segment on the label that resembles a scroll with the name of the saint or religious icon."

| | | |
|---|---|---|
| **22.** | Stained glass arranged in a bullet-type or cathedral shape is used on a variety of religious inspired products including candles, prayer cards, and coloring books. For example:<br><br><br><br>    | **Ex A-7** (samples of stained glass products). |
| **23.** | Cathedral or bullet-shaped stained glass windows are commonly used in churches. Stained glass has long been a feature associated with the Catholic Church. For example: | **Ex A-8** (samples of stained glass in churches). |



| | | |
|---|---|---|
| **24.** | Several other prayer candles utilize stained glass as a design element. For example: | **Ex A-7.** |

**E.     Mercado's Purported Copyrights**



| 33. | The prayer hands on the back label are copied from a famous work created by Albrecht Dürer in approximately 1508 entitled Betende Hände (or Praying Hands)  Dürer's Praying Hands                    Mercado's Praying Hands | **Ex A-9** (Wikipedia article for Praying Hands (Dürer)). **Ex A-10** (Comparison of Mercado and Dürer Praying Hands). |

**F.    Mercado's Prayer Candles**







| 48. | In response to an interrogatory, Mercado refused to provide its basis for nonfunctionality of the Asserted | **Ex A-5** at 23. |

| | |
|---|---|
| Trade Dress as a whole and instead provided arguments as to some elements individually. | |
| ████████████████████████████ | ████████████ |

### G.   Indio's Prayer Candles

| | | |
|---|---|---|
| **50.** | Indio sells at least three lines of prayer candles – Eternalux, Benedictum, and Templar. Templar candles are the only candles accused of infringement.  Eternalux            Templar | ████████ |

| | | |
|---|---|---|
| ██████████████████████ | | ████████ |
| ████████████ | | ████████ |
| | | ████████. |
| **54.** | Indio obtained a registered trademark for its Templar Candle logo on November 13, 2012.  | **Ex C** at ¶14, Ex 3. |
| **55.** | Indio's name, address, and Templar Candle logo are prominently displayed directly below the prayer in the customary position on the back of the Templar candle.  | **Ex C** at ¶15. **Ex A-16** (pictures of Templar label). |





| H. | **Surveys** | |
|---|---|---|
| **62.** | Mercado did not conduct a secondary meaning survey. There is no consumer testimony, nor any consumer perception evidence of secondary meaning. | **Ex A-5** at 27-30. |







**I.     Mercado's Trademark Infringement Claim**

## J.   Mercado's Purported Damages

| 88. | Mercado claims lost profits, disgorgement of profits, restitution, punitive damages, and payment for corrective advertising. Mercado provided no theory or amount for these damages claims apart from the lost profits claim. | **Ex A-5** at 6. **Ex A-19** (Amended Initial Disclosures) at 7. |
|---|---|---|







## II.    CONCLUSIONS OF LAW

### A.    Summary Judgment Standard

1.    The Supreme Court has explained that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

2.    A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

3.    The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrates the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991); *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

4.    If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Id*.  The burden then shifts to the party opposing the motion who must set forth by affidavit or other evidence of "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

5.    "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at 252). A genuine

issue of material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

6.    The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252.  Conclusory or speculative testimony is insufficient to meet the burden to establish a genuine issue of fact defeating summary judgment. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

7.    Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**B.    Trade Dress Standard**

8.    The plaintiff asserting trade dress infringement bears the burden to prove: "(1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1005 (9th Cir. 1998); *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987)).

9.    In order to establish ownership of trade dress to be protected under the Lanham Act, a plaintiff must prove that the trade dress was used in commerce. *Genesis Strategies, Inc. v. Pitney Bowes, Inc.*, 50 F. Supp. 3d 59, 63 (D. Mass. 2014); *Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, at *5 (N.D.

Ga. Feb. 12, 2008); *CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626, 630 (9th Cir. 2007) (recognizing that use in commerce is a fundamental requirement to obtain and maintain trademark rights).

10.    A party asserting common law rights must show that it is the senior user of the trade dress with a legally sufficient market penetration in a defined geographic market. *Glow Industries, Inc. v. Lopez*, 252 F. Supp.2d 962, 983 (C.D. Cal. 2002).

## C.    Common Law Trade Dress Ownership

11.    The scope of protection afforded to an unregistered common law mark is narrowly tailored to the evidence presented. *Lerner Stores Corp. v. Lerner*, 162 F2d 160, 164 (9th Cir. 1947) (San Jose not included in trademark rights established in San Francisco and Oakland); *Adray v. Adry-Mart, Inc.*, 76 F3d 984, 989 (9th Cir. 1995) (applying the four factor market penetration test and holding a trademark had not acquired secondary meaning outside Orange County).

12.    Legally sufficient market penetration in a geographic area is determined by examining: (1) the trademark user's volume of sales of the trademarked product; (2) the positive and negative growth trends in the geographic area; (3) the number of persons buying the trademarked product in relation to the number of potential purchasers; and (4) the amount of advertising in the area. *Natural Footwear*, 760 F.2d at 1398-99; *Adray*, 76 F.3d at 989; *Glow Indus.*, 252 F.Supp.2d at 983; *Credit One*, 661 FSupp.2d at 1138; *Hangingout*, 54 F.Supp.3d at 1118.

13.    Failure to present any evidence as to the actual location of [customers]" is "dispositive." *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1122 (S.D. Cal. 2014).   "The extent of market penetration depends upon the volume of sales, the positive and negative growth trends, the number of people who purchased the party's goods in relation to the number of potential customers, and the amount of advertising." *Glow Industries, Inc.* 252 F. Supp.2d at 983.

14. General testimony of "nationwide sales" and website sales without "level of sales in any location" is not adequate to establish "legally sufficient market penetration." *Id.* at 984-85.

15. In addition, "if Plaintiffs' trade dress infringes . . . [another's] copyrights . . . there is no trade dress right[.]" *Elements Spirits, Inc. v. Iconic Brands, Inc.*, 2015 U.S. Dist. LEXIS 75986, at *13 (C.D. Cal. June 11, 2015).

**D.    Genericness**

16.  "[G]eneric product designs are unprotectable even upon showing of a secondary meaning." *SCG Characters LLC v. Telebrands Corp.*, 2015 WL 4624200, at *7 (C.D. Cal. Aug. 3, 2015) (citing *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F.Supp.2d 1168, 1174 (N.D. Cal.2007).

17. Genericness of "product design" covers three situations, covers three situations: (1) if the definition of a product design is overbroad or too generalized; (2) if a product design is the basic form of a type of product; or (3) if the product design is so common in the industry that it cannot be said to identify a particular source." *Walker & Zanger, Inc.*, 549 F. Supp. 2d at 1174.

18. A product design will not be protectable "if a product design is the basic form of a type of product" or "the definition of a product design is overbroad or too generalized." *Walker & Zanger, Inc. v. Paragon Indus., Inc.,* 549 F.Supp.2d 1168, 1174 (N.D. Cal. 2007).

19. If trade dress is "pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectible style, theme or idea," a court may "winnow[] out claims that are overbroad as a matter of law" due to genericism. *Stop Staring! Designs v. Tatyana, LLC*, 625 F. App'x 328, 330 (9th Cir. 2015).

20. Where the product design, as described, comprises common characteristics, it is incapable of acting as a source identifier and thus generic. *Kendall–Jackson Winery, Ltd. v. E & J Gallo Winery*, 150 F.3d 1049 (9th Cir. 1998); *Mana Prods., Inc. v. Columbia Cosmetics Mfg.*, Inc., 65 F.3d 1063, 1070 (2d Cir.

1   1995); *Big Island Candies Inc. v. Cookie Corner*, 269 F. Supp. 2d 1236, 1244 (D.

2   Haw. 2003).

3        21.    A mere description of concepts is unprotectible as generic for a product

4   for which aesthetics affects the quality and use. *Walker & Zanger, Inc. v. Paragon*

5   *Industries, Inc.*, 549 F. Supp. 2d 1168, 1176 (N.D. Cal. 2007).  In *Walker*, a proposed

6   trade dress was considered overbroad where the plaintiff used "empty generalities in

7   the face of more precise alternatives," *e.g.*, the phrase "colors reminiscent of

8   Provence" instead of listing the actual colors." *Id.*

9        22.    Overbroad descriptions of trade dress that are no more than a concept or

10  idea are rendered generic and unprotectable. *Walker & Zanger, Inc.*, 549 F. Supp. 2d

11  at 1176; *A'lor Int'l, Ltd. v. Tappers Fine Jewelry, Inc.*, 2013 WL 12174580, at *5 (C.D.

12  Cal. Apr. 1, 2013), *aff'd in relevant part*, 605 F. App'x 662 (9th Cir. 2015); *Shevy*

13  *Custom Wigs, Inc. v. Aggie Wigs*, 2006 WL 3335008, at *5 (E.D. N.Y. Nov. 17, 2006);

14  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001); *Yurman Design,*

15  *Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001) (finding that a trade articulated as

16  "the artistic combination of cable jewelry with other elements" was "too broad to be

17  a protectable, source-identifying expression").

18  **E.    Secondary Meaning**

19       23.    "[P]roduct design, like color, is not inherently distinctive" and is

20  entitled to protection under Lanham Act as unregistered trade dress only upon

21  showing that it has acquired secondary meaning. *Wal-Mart Stores, Inc. v. Samara*

22  *Bros., Inc.*, 529 U.S. 205, 212-214 (2000).

23       24.    In the case of product design, "consumer predisposition to equate the

24  feature with the source does not exist" because consumers "are aware of the reality

25  that, almost invariably, even the most unusual of product designs-such as a cocktail

26  shaker shaped like a penguin-is intended not to identify the source, but to render the

27  product itself more useful or more appealing." *Wal–Mart Stores, Inc.*, 529 U.S. at

28  212–213.

25. "Secondary meaning is not easily established: proof of secondary meaning entails vigorous evidentiary requirements." *Express, LLC v. Forever 21, Inc.*, 2010 WL 3489308, at *7–9 (C.D. Cal. Sept. 2, 2010). The plaintiff must present sufficient evidence of secondary meaning to create a genuine dispute of fact. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 873 (9th Cir. 2002); *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009); *Red Star Traders, LLC v. Abbyson Living Corp.*, 2016 WL 9108405, at *3 (C.D. Cal. June 22, 2016).

26. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos v. Taco Cabana*, 505 U.S. 763, 766 n.4 (1992). "Secondary meaning is the consumer's association of the mark with a particular source or sponsor." *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992). The "chief inquiry is directed towards the consumer's attitude about the mark in question" *Carter-Wallace, Inc. v. P&G Co.*, 434 F.2d 794, 802 (9th Cir. 1970).

27. A substantial segment of consumers must associate the product with a single source. *EZ Pedo, Inc. v. Mayclin Dental Studio, Inc.*, 284 F. Supp. 3d 1065, 1071 (E.D. Cal. 2018). Secondary meaning is the "mental association by a substantial segment of consumers and potential customers between the alleged trade dress and a single source of the product." *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 873 (9th Cir. 2002).

28. The owner of the mark is "required to prove that [the mark] had acquired secondary meaning" before the alleged infringer "began using [its own mark.]" *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352,1358 (9th Cir. 1985); *Cicena Ltd. v. Columbia Telecomm. Group*, 900 F.2d 1546, 1552 (Fed. Cir. 1990).

29. Direct evidence — like consumer surveys — provides the strongest evidence of secondary meaning. *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609,

615 (9th Cir. 1989).  A secondary meaning survey is the best evidence of secondary meaning because it shows what is in the minds of the product's consumers and whether the "primary significance" of the trade dress to consumers is the product's source rather than the product itself.  *Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 704 (N.D. Ill. 2009).   All the other types of evidence—sales, advertising, copying—are circumstantial.  *Id.*

30.    It is "very difficult . . . to prove that consumers associate the mark . . . without the appropriate surveys and testimony." *LHO Chi. River, LLC v. Perillo*, 2016 U.S. Dist. LEXIS 183691 *14 (N.D. Ill. 2016); *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979); *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 849. (5th Cir. 1970). While the absence of direct consumer testimony and consumer surveys is not alone fatal to plaintiff's claims, the absence of such evidence certainly does not advance plaintiff in meeting its burden. *See Tenneco Automotive Operating Co, Inc. v. Kingdom Auto Parts*, 410 Fed. Appx. 841, 851 (6th Cir. 2010).

31.    Indirect circumstantial evidence may include "exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; [and its] established place in the market." *Reserve Media, Inc.*, 2017 WL 123420, at *7; *Vision Sports, Inc.*, 888 F.2d at 615; *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 68 F. Supp. 3d 1170, 1173 (C.D. Cal. 2014). But, evidence of a manufacturer's sales, advertising and promotional activities is only material when accompanied by evidence relating to the effectiveness of efforts to create secondary meaning. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987); *Seed Lighting Design Co., Ltd. v. Home Depot*, 2005 WL 1868152, at *6 (N.D. Cal. Aug. 3, 2005).

32.    Exclusive use alone is insufficient evidence of secondary meaning.  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1327 (Fed. Cir. 1999). "Whether secondary meaning attaches after a period of exclusive use depends on how, rather than how long, the plaintiff used its mark or design." *Cont'l Lab.*, 114 F. Supp. 2d at 1004-05.

33.     Use of a design different from others, however, does not suffice to show distinctiveness in the minds of consumers without evidence of the effectiveness of such use. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1327-28 (Fed. Cir. 1999). A purported "long and exclusive use" is immaterial if the asserted marks "do not actually serve as a source identifier." *Wilden Pump & Eng'g LLC v. JDA Glob. LLC*, 2012 WL 5363319, at *2 (C.D. Cal. Oct. 29, 2012); *Gallagher v. Funeral Source One Supply & Equip. Co.*, 2015 U.S. Dist. LEXIS 149780, at *23-26 (D.N.H. Nov. 4, 2015).

34.     "[E]vidence of advertising and sales is entirely circumstantial and does not necessarily indicate that consumers associate a mark with a particular source." *Icon Enterprises Int'l, Inc. v. Am. Prod. Co.*, 2004 WL 5644805, at n. 9 (C.D. Cal. Oct. 7, 2004). The crucial issue is not "the fact of product promotion, but the effectiveness of such promotion in creating a secondary meaning for the trade dress at issue." *Homeland Housewares, LLC v. Euro-Pro Operating LLC*, 2014 WL 4187982, at *8 (C.D. Cal. Aug. 22, 2014).

35.     "[S]ales figures alone are inadequate to establish a connection between a product and its source." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 873 (8th Cir. 1994); *Cicena Ltd. v. Columbia Telcoms. Grp.,* 900 F.2d 1546, 1551 (Fed. Cir. 1990). n product configuration cases, sales success will typically not be probative of secondary meaning without evidence connecting sales success to source-recognition. *Cont'l Lab. Prods.*, 114 F. Supp. 2d at 1002; *Aurora World, Inc*, 719 F. Supp. 2d at 1154-55 (C.D. Cal. 2009).

36.     A plaintiff must provide "supporting data to place [] raw sales figures into a coherent evidentiary context," such as market share, "geographic distribution of its sales" or promotional efforts suggesting a demand based on source rather than the usefulness of the product. *Cont'l Lab. Prods. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1003-04 (S.D. Cal. 2000). An annual chart of sales is unhelpful in establishing secondary meaning, particularly where much of the data occurred after a defendant

1  commenced its allegedly infringing activity.  *Cont'l Lab. Prods. v. Medax Int'l, Inc.*,

2  114 F. Supp. 2d 992, 1002-03 (S.D. Cal. 2000).

3      37.   Advertising evidence alone "is insufficient without evidence that the

4  advertising and coverage were aimed at the trade dress and its source identification

5  qualities."  *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235,

6  1247-48 (D. Colo. 2009) (citing *Art Attacks Ink, LLC v. MGA Entertainment Inc.*,

7  581 F.3d 1138, 2009 WL 2950659, at *6 (9th Cir. 2009)); *Yankee Candle Co., Inc.*

8  *v. Bridgewater Candle Co.*, LLC, 259 F.3d 25, 44 (1st Cir. 2001); *see also Thomas*

9  *& Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995) ("Advertising that

10  touts a product feature for its desirable qualities and not primarily as a way to

11  distinguish the producer's brand is not only not evidence that the feature has acquired

12  secondary meaning, it directly undermines such a finding.").

13      38.   Plaintiffs must demonstrate that promotion "was part of a campaign

14  designed to promote consumer identification with this design."  *Watson-Marlow, Ltd*

15  *v. Changzhou Prefluid Tech. Co.*, 2014 WL 12586432, at *4 (C.D. Cal. Aug. 1,

16  2014); *Walker & Zanger, Inc.,* 549 F. Supp. 2d at 1180.  Advertising evidence "must

17  feature in some way the trade dress itself." *First Brands Corp.*, 809 F.2d at 1383.

18      39.   "To be probative of secondary meaning, . . . advertising must direct the

19  consumer to those features claimed as trade dress. Merely 'featuring' the relevant

20  aspect of the product in advertising is no more probative of secondary meaning than

21  are strong sales; again, to provide protection based on extensive advertising would

22  extend trade dress protection to the label (or to the combination claim) without any

23  showing that the consumer associated the dress with the product's source." *Yankee*

24  *Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 44 (1st Cir. 2001) (*citing Int'l.*

25  *Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993)).

26      40.   Only "precise copying" may support secondary meaning and the stained-

27  glass designs are not remotely similar in design. *Asics Corp. v. Skechers U.S.A.*, 2007

28

WL 1424670, at *5 (C.D. Cal. Apr. 26, 2007); *Ear Charms, Inc. v. Bling Jewelry, Inc.*, 2017 WL 2957796, at *3 (C.D. Cal. Apr. 11, 2017).

41.     Copying is nevertheless irrelevant without evidence that the "*reason* for copying" was the intention to "pass off" the accused products as the plaintiffs. *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235 (D. Colo. 2009). The "knowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 397–99 (4th Cir. 2009).

42.     "Unadorned evidence of copying, without more, is hardly probative of secondary meaning" and "copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." *Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 705 (N.D. Ill. 2009).

43.     If the defendant takes steps to distinguish its products, such as with its own trademark, similarities in product design are not indicative of trading on any secondary meaning but instead indicative of normal competitive behavior to produce products that consumers find desirable. *Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 209-10 (D. Mass. 2015). Secondary meaning cannot be inferred from copying where a defendant displays its own trademarks. *Cont'l Lab. Prods.*, 114 F.Supp.2d at 1008; *Spark Indus., LLC v. Kretek Int'l, Inc.,* 2014 U.S. Dist. LEXIS 125538, at *58 (C.D. Cal. Aug. 28, 2014).

44.     In a product configuration trade dress infringement, consumers do not have to rely on a potentially distinctive configuration to identify the source of the product; rather, they can generally look to the packaging, trademarks, and advertising used to market the product, which are typically much less ambiguous. Consumers therefore have less need, and so are much less likely, to rely on a product configuration as an indicator of the product's source. *Clarus Transphase Sci., Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, at *15–16 (N.D. Ill. Oct. 6, 2006) (disclosure of the

1  producer's name on the product, which is "[t]he most common and effective means
2  of apprising intending purchasers of the source of goods).

3  **F.    A Lack of Copying and Substantial Similarity Re: Indio's Templar**
4           **Border Artwork was Decided as a Matter of Law and is Law of the Case**

5          45.    "Indio's border artwork design is not, however, substantially similar to
6  Mercado's design." DN 26 at 6. "Mercado cannot state a viable copying claim"
7  because "Mercado's expression are not similar to Indio's expression." DN 25 at 6-7.

8          46.    "Under [the law of the case] doctrine, a court should not reopen issues
9  decided in earlier stages of the same litigation." *Agostini v. Felton*, 521 U.S. 203,
10 236 (1997). The doctrine of law of the case "encompasses a court's explicit decisions
11 as well as those issues decided by necessary implications." *Eichman v. Fotomat*
12 *Corp.*, 880 F.2d 149, 157 (9th Cir. 1989).  The law of the case controls unless the
13 first decision is clearly erroneous and would result in manifest injustice, an
14 intervening change in the law has occurred, or the evidence on remand is
15 substantially different.  *Id.*

16 **G.    Functionality**

17         47.    The party asserting trade dress protections bears the burden to prove
18 nonfunctionality. *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 683
19 (9th Cir. 2012) (15 U.S.C. § 1125(a)(3)).

20         48.    Plaintiff bears the burden to demonstrate that its combination of
21 features is nonfunctional. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252,
22 1258 (9th Cir.2001); *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d
23 130, 136 (D. Mass. 2003) (summary judgment granted that plaintiff failed to prove
24 overall design was nonfunctional).  Ultimately, to qualify as trade dress, "the entire
25 design must be arbitrary or non *de jure* functional." *Leatherman*, 199 F.3d at 1012;
26 *Textron, Inc. v. U.S. Int'l Trade Comm'n*, 753 F.2d at 1025.

27         49.    It is more difficult to assert a trade dress interest in a product
28 configuration than in packaging—configuration is both less likely to signify source

than packaging, and more likely to be functional. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999). The Supreme Court has explicitly recognized that consumers often do not perceive a products design as identifying the source of the product, but rather "to render the product itself more useful or more appealing." *Wal-Mart Stores,* 529 U.S. at 213.

50. "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *TrafFix Devices*, 532 U.S. at 34. Trade dress is about protecting signifiers of source. *Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 703 (N.D. Ill. 2009) (granting SJ of functionality). "[F]unctionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co*, 514 U.S. at 164.

51. The nonfunctionality requirement "channel[s] the legal protection of useful designs from the realm of trademark to that of patent." *Groeneveld*, 730 F.3d at 508. "Such channeling ensures that the high public costs of monopoly are not imposed without an assurance that the design satisfies the rigorous requirements of patentability, including novelty and nonobviousness, and is protected for only a limited period of time." *Id.* (citing *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 164–65 (1995)).

52. "A product feature is functional and cannot serve as a trademark if the product feature is **essential to the use or purpose of the article or if it affects the cost or quality of the article**, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (emphasis added). Courts consider several factors, including: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design

results from a comparatively simple or inexpensive method of manufacture." *Id.* at 1260; *Disc Golf*, 158 F.3d at 1006.

53.     "In determining functionality, a product's trade dress must be analyzed as a whole." *Int'l Jensen*, 4 F.3d at 823; accord *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1133 (N.D. Cal. 2009) (citing *Kendall–Jackson*, 150 F.3d at 1050).

54.     "[I]n order to establish nonfunctionality the party with the burden must demonstrate that the product feature[s] 'serves no purpose other than identification.'" *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1531 (9th Cir. 1992), as amended (Jan. 6, 1993) (citing *Keene Corp. v. Paraflex Indus., Inc.*, 653 F.2d 822, 826 (3d Cir. 1981).

55.     Functional features of a product are features "which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980).

56.     A trade dress is function if the trade dress is "essential to the use or purpose of the article or affects its cost or quality." *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067, 1074 (C.D. Cal. 2012); *Millennium Labs. v. Ameritox, Ltd.,* 817 F.3d 1123, 1129 (9th Cir. 2016); *TrafFix Devices v. Marketing Displays,* 532 U.S. 23. 31-34 (2001).

57.     A product feature is "'essential' to the use or purpose of a product if the feature contains an attribute that contributes to the intended operation of that particular product in a significant way" or "if it is dictated by the functions to be performed by the article." *Moldex-Metric, Inc. v. McKeon Prods.*, 2016 U.S. Dist. LEXIS 44877, at *10-12 (C.D. Cal. Mar. 31, 2016) (no triable issue that green color was functional as it is "essential to the use or purpose" of ear plugs due to inherent attribute of increased visibility that contributes to intended use.)

58.    The fact that the trade dress is a combination of elements is insufficient to carry the burden of providing sufficient admissible evidence of non-functionality. *Red Star Traders, LLC v. Abbyson Living Corp.*, 2016 WL 9108405, at *4–5 (C.D. Cal. June 22, 2016) (noting that "the plaintiff's burden is made heavier in the context of product design" to establish non-functionality and that "a design 'need only have some utilitarian advantage to be considered functional.'").

59.    Courts "focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards*, 251 F.3d at 1259*; Kendall–Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1050 (9th Cir. 1998).

60.    Nevertheless, when "all the component parts of a product design are functional, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional." *Tool Group, Inc. v. Cooper Industries*, 199 F.3d 1009, 1013 (9th Cir. 1999).

61.    Functionality can be determined where the component parts of product configuration trade dress are functional." *Antioch Co. v. Western Trimming Corp.*, 196 F. Supp. 2d 635, 643 (S.D. Ohio 2002) (citing *Leatherman Tool*, 199 F.3d at 1013). A mere combination of functional components with nondescript or common colors, shapes, and configurations does not meet the requisite standards. *See Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F. Supp. 3d 969, 1000 (D. Minn. 2014).

62.    As part of the *Disc Golf* factors, courts assess whether the trade dress is "essential to the use or purpose of the article [or] affects [its] cost or quality." *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1129 (9th Cir. 2016) ("[T]he plaintiff's burden is made heavier in the context of product design" to establish non-functionality and that "a design 'need only have some utilitarian advantage to be considered functional.'")

63.    Once functionality is established, "[t]here is no need . . . to engage . . . in speculation about other design possibilities[.]" *TrafFix*, 532 U.S. at 33. Therefore, the existence of alternative designs themselves cannot negate a trademark's functionality under the traditional rule. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 (1982).

64.    Courts also consider whether protection of a feature as trade dress would "impose a significant non-reputation-related competitive disadvantage." *Millennium Labs.*, 817 F.3d at 1129; *Tacori Enterprises v. Scott Kay, Inc.*, 2011 WL 12816685, at *4 (C.D. Cal. Mar. 3, 2011).

65.    A plaintiff's assertions regarding the design can be a concession that a design serves an aesthetic function rather than a source-identification function. *Clarus Transphase Sci., Inc. v. Q-Ray, Inc.*, 2006 WL 4013750, at *10 (N.D. Ill. Oct. 6, 2006). A seller should not be allowed to obtain, in the name of trade dress, a monopoly over the elements of a product's appearance that either are not associated with a particular producer or that have value to consumers that is independent of identification. *Id.*

66.    A seller's advertising of utilitarian advantages of a feature constitutes strong evidence of functionality. *Talking Rain Bev. Co. v. S. Beach Bev. Co.,* 349 F.3d 601, 604 (9th Cir. 2003).

67.    A design that motivates purchase through increasing the intrinsic value aesthetically is functional. *Int'l Order of Job's Daughters v. Lindeburg*, 633 F.2d 912, 918 (9th Cir. 1980); *Aurora World, Inc.,* 719 F. Supp. 2d at 1149; *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343-34 (9th Cir. 1952); *Farmgirl Flowers, Inc. v. Bloom That, Inc.,* 2015 WL 1939424, at *8 (N.D. Cal. Apr. 28, 2015).

68.    Consumers should not "be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves." *Wal-Mart Stores*, 529 U.S. at 213-214. Nonfunctionality can "involve consideration of [a design feature's] esthetic appeal." *Id.* A product feature whose impact is only

"decorative and aesthetic, with no source-identifying role, cannot be given exclusive rights under trade dress law." *Clicks Billiards, Inc. v. Sixshooters, Inc*., 251 F.3d 1252, 1258 (9th Cir. 2001).

## H.    Likelihood of Confusion

69.    The ultimate determination of likelihood of confusion is a legal conclusion. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc*., 616 F.2d 440, 443-44 (9th Cir.1980) (*citing J.B. Williams Co., Inc. v. Le Conte Cosmetics, Inc*., 523 F.2d 187, 191-92 (9th Cir.1975) and *Sleekcraft Boats* at 348-54).    The factual elements that make up the likelihood of confusion determination include evidence of actual confusion, the defendant's intent in adopting the mark, similarity of marks, similarity of goods and marketing channels, and the strength of the mark." *Chesebrough–Pond's, Inc. v. Faberge, Inc*., 666 F.2d 393 (9th Cir. 1981); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

70.    To establish a likelihood of confusion., the "[Plaintiff] must show sufficient evidence to permit a rational trier of fact to find that confusion is probable, not merely possible." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir. 2005); *Bd. of Supervisors for LSU A&M Coll. v. Smack Apparel Co*., 550 F.3d 465, 478 (5th Cir. 2008).

71.    "The test for a likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).

72.    Not all factors are created equal, and their relative weight varies based on the context of a particular case. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1145 (9th Cir. 2011); *Jada Toys Inc.* v. *Mattel, Inc.,* 496 F.3d 974, 979 (9th Cir. 2007).   In conducting the analysis, courts do not merely count beans or tally points. *Dreamwerks Prod. Grp., Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir. 1998).

73.     Two particularly probative factors are the similarity of the marks and the proximity of the goods given the marketing channels used. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017).

74.     Similarity of the marks is "a critical question in the likelihood of confusion analysis." *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). Likelihood of confusion is presumed "when the offending mark is a counterfeit mark, or a mark virtually identical to a previously registered mark coupled with the intent to pass off or borrow from established good will." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.* (9th Cir.2011) When "two marks are entirely different . . . no reasonable jury could find a likelihood of confusion." *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1165 (9th Cir. 2009).

75.     A lack of similarity alone can warrant a court deciding on a lack of likelihood of confusion as a matter of law. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1384 (9th Cir. 1987); *E. & J. Gallo Winery v. Proximo Spirits, Inc.*, 583 Fed. Appx. 632, 635–36 (9th Cir. 2014); *Falcon Stainless, Inc. v. Rino Companies, Inc.*, 572 Fed. Appx. 483, 486 (9th Cir. 2014).

76.     A determination of no substantial similarity in a copyright claim carries over to the likelihood of confusion analysis as a result of the crucial role of similarity. *Litchfield v. Spielberg*, 736 F.3d 1352, 1358 (9th Cir. 1984); *Black's Guide, Inc. v. Mediamerica, Inc.*, 1990 WL 169141, at *6 (N.D. Cal. Aug. 15, 1990); *Am. Greetings Corp. v. Easter Unlimited, Inc.*, 579 F. Supp. 607, 616 (S.D. N.Y. 1983); *Alchemy II, Inc. v. Yes! Ent. Corp.*, 844 F. Supp. 560, 570 (C.D. Cal. 1994); *Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 246 (2d Cir. 1983).

77.     A "lack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1093 (C.D. Cal. 2003); *Karoun Dairies, Inc. v. Los Altos Food Prods.*, 107 Fed. Appx. 785, 786 (9th Cir. 2004)..

78.   "De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion[.]" *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1149 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002).  "Probable confusion cannot be shown by pointing out that at someplace, at some time, someone made a false identification." *Wallach v. Longevity Network, Ltd.*, 2005 WL 5958091, at *14 (C.D. Cal. Sept. 1, 2005).

79.   "[A] handful of examples of anecdotal confusion are insufficient." *Stonefire Grill, Inc. v. FGF Brands, Inc*., 987 F. Supp. 2d 1023, 1054, (C.D. Cal. 2013). "[I]n light of both parties' high volume of business," a single instance of confusion is "insignificant" and "de minimus" *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987); *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054, (C.D. Cal. 2013); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir.2012).

80.   "Differences in price . . . should be considered in measuring product proximity." *New Milani Grp., Inc. v. J.T. Bella, LLC*, 2013 WL 12116579, at *14 (C.D. Cal. July 22, 2013).

81.   Price may also be considered when evaluating customer degree of care, however, "price alone is not determinative of the care a consumer will take in making purchases, and our touchstone remains the general impression that is left with the ordinary consumer." *Herbalife Int'l, Inc. v. Lumene N. Am. LLC*, 2007 WL 4225776, at *10 (C.D. Cal. Oct. 15, 2007). A court "must look at the specific products in question rather than just price" when considering "relatively inexpensive items." *Id*; *Toughlove America, LLC, v. MTV Networks Company, et al.*, 2009 WL 10669245, at *14 (C.D. Cal. Apr. 21, 2009). The degree of care factor is evaluated by analyzing "the type of good or service offered and the degree of care one would expect from the average buyer exercising ordinary caution." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014).

82.     The lack of inherent distinctiveness of the Asserted Trade Dress renders it weak.  *Kind LLC v. Clif Bar & Co.,* 2014 WL 2619817, at *6 (S.D.N.Y. June 12, 2014).

83.     Distinctive labeling and packaging is a strong indication that there is no likelihood of confusion.  *Syndicate Sales, Inc. v. Hampshire Paper Corp*., 192 F.3d 633, 636–37 (7th Cir. 1999).

84.     Summary judgment is proper where a plaintiff had "no evidence" that consumers confused the accused products with the trademarked products.

## I.     Surveys for Likelihood of Confusion

85.     The Ever-Ready survey format is "considered the prevailing standard for trademark survey research in cases involving strong mark." *VIP Prods., LLC v. Jack Daniel's Props.*, 2018 U.S. Dist. LEXIS 14432, at *28 (D. Ariz. Jan. 29, 2018).

86.     A Squirt survey is only appropriate "where consumers would have proximately encountered." *THOIP v. Walt Disney Co*., 690 F. Supp. 2d 218, 238 (S.D. N.Y. 2010); *Moroccanoil, Inc. v. Zotos Int'l, Inc*., 230 F. Supp. 3d 1161, 1175 (C.D. Cal. 2017).

87.     A lack of "side by side" selling indicates a lack of proximity even if the parties "employ the same general means of marketing and product delivery and "both products are sold via internet websites." *Clarus Transphase Sci., Inc. v. Q-Ray, Inc*., 2006 WL 4013750, at *10 (N.D. Ill. Oct. 6, 2006).

88.     Courts have criticized Squirt surveys for utilizing closed-ended questions that can lead participants to the desired answer generating demand effects. *Scott Fetzer Co. v. House of Vacuums Inc*., 381 F.3d 477, 487-88 (5th Cir. 2004) (Squirt survey pushes "survey participants to search for any connection, no matter how attenuated . . . instead of permitting participants to make their own associations"); *Riviana Foods Inc. v. Societe Des Produits Nestle S.A*., 1994 U.S. Dist. LEXIS 20267, 1994 WL 761242, at *4 (S.D. Tex. Dec. 20, 1994) (rejecting

Squirt survey because it "used a leading question on the likelihood of confusion issue").

89.     The flaws in a Squirt-type survey can warrant giving the survey no weight in the likelihood of confusion assessment. *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1037 (N.D. Cal. 2017).

90.     A survey can be properly excluded for "fail[ing] to sufficiently replicate the manner in which consumers encountered the parties' products in the marketplace." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 238 (S.D. N.Y. 2010).

91.     Forcing respondents to look at stimuli for a minimum amount of time creates a situation "not terribly likely to happen in the marketplace" and "demand effects" that leads "respondents to pick the expected answer and renders the survey's results completely unreliable." *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1026 (N.D. Cal. 2017).

92.     The "proper universe to survey is the potential buyers of the junior user's goods or services." *Hansen Bev. Co. v. Cytosport, Inc*, 2009 U.S. Dist. LEXIS 120508, at *39 (C.D. Cal. Nov. 4, 2009); 6 McCarthy on Trademarks, § 32:159.

93.     A survey that targets an entirely inapplicable respondent universe renders the survey inadmissible.  *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d at 878; *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 879 (9th Cir. 1999) (rejecting reliance on survey, when survey failed to address the appropriate sample of the population.)

94.     The "appropriate use of controls is critical" to "sufficiently account for factors legally irrelevant to the requisite confusion." *Cumberland Packing v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-75 (E.D. N.Y. 1999).

95.     A survey should be excluded where the control did not share "the most prominent and eye-catching features" and "improperly suggested to the participants that [Defendant's product] was the 'correct' answer." *Brighton Collectibles, Inc. v. RK Texas Leather MFG*, 923 F.Supp.2d 1245, 1257-58 (S.D. Cal. 2013); *See*

*Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp. 625, 634 (E.D. Va. 1986) (rejecting survey when defendant's product "stood out like a bearded man in a lineup with four clean-shaven men"); *Simon Prop. Grp. L.P. v. my-Simon, Inc*., 104 F. Supp. 2d 1033, 1051 (S.D. Ind. 2000) (rejecting survey when format tested "nothing more than the memory and common sense of a respondent" but nothing relevant about consumer confusion).

96.     A high confusion result in the control group can also be fatal and render a survey inadmissible. *Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc*., 2013 U.S. Dist. LEXIS 198591, at *11 (C.D. Cal. June 21, 2013). "It would not be desirable for a control to yield confusion estimates that exceeded 10 percent. If it did, the control itself would begin to reach an actionable level of confusion and its utility as a control thereby compromised." *Id.* at 12. *See S.S. Kresge Co. v. United Factory Outlet, Inc*., 598 F.2d 694, 697 (1st Cir.1979) (7.2% level of confusion discredited because 5.7% of the respondents reached the same conclusion with respect to the control.")

97.     The only explanation for a high rate of confusion is that the "Survey was designed (successfully) to lead its respondents to infer that a connection existed between the parties' products." *Kargo Glob., Inc. v. Advance Magazine Publrs., Inc*., 2007 U.S. Dist. LEXIS 57320, at *28 (S.D. N.Y. Aug. 6, 2007). A high confusion rate among control group "is strong if not dispositive proof that the survey was designed to lead respondents to conclude that the parties' products were related." *Id.*

98.     "[A] net level above 10% should be required from a Squirt format." Likelihood of Confusion Studies and the Straitened Scope of Squirt, 98 Trademark Rep. 739 (2008), FN 42; *Cairns v. Franklin Mint Co.,* 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998). *Wuv's Int'l, Inc. v. Love's Enters., Inc*., 208 U.S.P.Q. 736, 756 (D. Colo. 1980).

99.     "When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely."

McCarthy § 32.189; *See Wuv's Internat'l, Inc. v. Love's Enterprises, Inc*., 208 U.S.P.Q. 736, 756 (D. Colo. 1980) (9% amounts to "questionable amount of confusion."); *Newport Pa-cific Corp. v. Moe's Southwest Grill, LLC*, 2006 WL 2811905 (D. Or. 2006) (dismissing summary judgment finding that 14% confusion result is "barely above McCarthy's threshold that confusion results below 10% are evidence that confusion is not likely.")

**J.   First Sale Defense**

100.   A trademark holder's right to control sale of a trademarked product is exhausted upon a first sale to another party. *Prestonettes, Inc., v. Coty*, 264 U.S. 359 (1924).

101.   The repackaging exception itself is limited and only requires a notice of repackaging. *Brilliance Audio v. Haights Cross Communs. Inc*., 474 F.3d 365, 369 (6th Cir. 2007) (citing *Enesco Corp. v. Price/Costco Inc*., 146 F.3d 1083 (9th Cir. 1998)).

102.   Damages are unavailable and the only available relief is the requirement of a prospective notice that the product was repackaged. SOF ¶ 87; *Farouk Sys. v. Target* Corp., 2008 U.S. App. LEXIS 1225, at *9-10 (5th Cir. Jan. 22, 2008); *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924).

**K. Lost Profits**

103.   Under § 1117(a), a plaintiff may recover an infringing defendant's profits in two situations: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly obtained profits. *See Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1407 (9th Cir. 1993). Any damages award pursuant to the Lanham Act "shall constitute compensation and not a penalty." § 1117(a).

104.   A plaintiff seeking lost sales bears the burden of establishing "but-for" damages. *See Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 620-621 (9th Cir. 1993). Damages in an action for trademark infringement "are typically measured by any

direct injury the plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for infringement." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993); *QS Wholesale, Inc. v. World Mktg.*, 2013 U.S. Dist. LEXIS 67211, at *19-21 (C.D. Cal. May 9, 2013) (plaintiff failed to "present specific evidence that would establish monetary damages with 'reasonable certainty" and instead "only offers conclusory and speculative assertions" that accused conduct damaged goodwill)

105.   To obtain damages for lost profits, the plaintiff must demonstrate that the "allegedly infringing trade dress caused a rise" in defendant's sales" or a decline in plaintiff's sales. *Stop Staring! Designs v. Tatyana, LLC*, 625 F. App'x 328, 330 (9th Cir. 2015) (affirming no lost profits where plaintiff failed to show that the "alleged trade dress infringement caused an effect on either company's bottom line").

106.   A sales correlation alone is not evidence of causation.  *Stop Staring! Designs v. Tatyana, LLC*, 2012 U.S. Dist. LEXIS 192949, at *9 (C.D. Cal. Feb. 21, 2012).  The onus is on the plaintiff "to combine evidence of divergent fortunes with evidence tending to discount the importance of other market factors" as the basis for divergent factors to establish that falling sales was caused by the alleged infringement.  *Stop Staring! Designs v. Tatyana, LLC*, 2012 U.S. Dist. LEXIS 195638, at *1-4 (C.D. Cal. Sep. 13, 2012), aff'd, 625 F. App'x 328, 330 (9th Cir. 2015).

107.   Direct competition is required between the plaintiff and the infringer; "if there is no competition, there can be no diversion of customers." *Maier Brewing*, 390 F.2d at 121; *see also Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *7 (N.D. Cal. July 14, 2011).

108.   Damages cannot be claimed based on products for "which no likelihood of confusion existed."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).

**L.     Willfulness**

109.    "Courts adjudicating trademark disputes, however, often address the issue of a party's willfulness at the summary judgment stage, before ruling on the merits of a trademark infringement dispute." *Razor USA LLC v. Vizio, Inc*., 2015 WL 12656941, at *5 (C.D. Cal. Oct. 19, 2015).

110.    Willfulness requires a "deliberate intent to deceive about the source of the product." *Lindy Pen Co*., 982 F.2d 1400, 1406 (9th Cir. 1993). The *Lindy Pen* Court explained "willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' misleading,' or 'fraudulent' to conduct that meets this standard." *Id.* at 1406.

111.    The "operative question for willful infringement is not whether there was knowledge of another mark but instead whether there was 'knowing use of a mark, with the belief that there is no confusion, does not constitute willful infringement.'" *Reserve Media, Inc. v. Efficient Frontiers, Inc.*, 2017 WL 123420, at *9-10 (C.D. Cal. Jan. 11, 2017) (citing *Blau v. YMI Jeanswear, Inc.*, 2004 WL 5313967, at *6 (C.D. Cal. Jan. 2, 2004), *aff'd*, 129 F. App'x 385 (9th Cir. 2005)); *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1096 (C.D. Cal. 2003)).

**M. Disgorgement of Profits**

112.    "In the Ninth Circuit, willfulness is required to disgorge an infringer of its ill-gotten profits." *Spin Mater, Ltd. v. Zobmondo Entmt., LLC*., 944 F. Supp. 2d 830, 846-48 (C.D. Cal. 2012); *Razor USA LLC v. Vizio, Inc.*, 2015 WL 12656941, at *5 (C.D. Cal. Oct. 19, 2015).  This requirement was explicitly reaffirmed in *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 441-42 (9th Cir. 2017).

113.    To "avoid penalizing an infringer in violation of the Lanham Act, the court in *Lindy Pen* required a showing of intent to "exploit the advantage of an established mark" and "gain the value of an established name of another" to justify

disgorgement." *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 845–49 (C.D. Cal. 2012).

**N.   Corrective Advertising**

114.   To establish a corrective advertising claim, the Plaintiff bears the burden of presenting evidence as to the foundational facts that 1) its mark lost value by presenting non-speculative evidence that its good will has actually been diminished and 2) the amount of damages.  *See Int'l Oddities v. Record*, 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013); *Quia Corp. v. Mattel, Inc*., 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011).

**O.   Related State Law Claims**

115.  The elements of the claims of a violation of the Lanham Act, 15 U.S.C. § 1125(a), California law, and common law are the same – failure under one is failure under all because the test for unfair competition under federal and California law is the same as for trademark infringement. *Century 21 Real Estate v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988); *see also Katzkin Leather, Inc. v. Nissan N. Am., Inc*., 2005 U.S. Dist. LEXIS 45540, at *23 (C.D. Cal. Dec. 22, 2005) (granting summary judgement on intentional interference claim based on same conduct as Lanham Act claim).  The standard for Lanham Act unfair competition is the same as that for trademark infringement.  *Glow Indus., Inc*., 252 F.Supp.2d at 975 n. 90.).

Based on the aforementioned statements of uncontroverted fact and conclusions of law, Indio respectfully requests that the court enter judgment for Indio.

Respectfully submitted,

Dated: April 26, 2017

By:  /s/ Linda D. Mettes
Linda D. Mettes
Rebecca J. Cantor
**BROOKS KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, MI  48075
Tel: 248-358-4400 / Fax: 248-358-3351
lmettes@brookskushman.com
rcantor@brookskushman.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Edward W. Lukas
**HARRINGTON, FOXX, DUBROW & CANTER, LLP**
333 South Hope Street, Suite 1000
Los Angeles, California 90071
Telephone: (213) 489-3222
elukas@kfdclaw.com

*Attorneys for Defendant*