REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

1

Edward W. Lukas (SBN 155214)
HARRINGTON, FOXX, DUBROW
& CANTER, LLP

2

333 South Hope Street, Suite 1000
Los Angeles, California 90071

3

Telephone: (213) 489-3222
elukas@kfdclaw.com

4

5

Linda D. Mettes (*Pro Hac Vice*)
Rebecca J. Cantor (*Pro Hac Vice*)

6

Kristin L. Murphy (*Pro Hac Vice*)
Anita C. Marinelli (*Pro Hac Vice*)

7

BROOKS KUSHMAN P.C.
1000 Town Center

8

Twenty-Second Floor
Southfield, Michigan 48075

9

Telephone:  248-358-4400
lmettes@brookskushman.com

10

rcantor@brookskushman.com

11

*Attorneys for Defendant*

12

13

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

14

15

16

MERCADO LATINO, INC. dba
CONTINENTAL CANDLE
COMPANY,

17

          *Plaintiff,*

18

v.

19

INDIO PRODUCTS, INC., a
California Corporation, and

20

DOES 1 through 10, Inclusive,

21

          *Defendant.*

22

23

24

25

Case No.  2:13-cv-01027-DDP-JEM

**DEFENDANT INDIO PRODUCTS, INC'S NOTICE OF MOTION AND MOTION AND MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF HAL PORET**

Judge: Hon. Dean D. Pregerson
Courtroom: 9C
Date: Monday, June 4, 2018
Time: 10:00 AM

26

27

28

**TO THE COURT, PLAINTIFF, AND ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on June 4, 2018 at 10:00 AM, or as soon thereafter as counsel may be heard in the above-entitled Court located at 350 W. 1st Street Ninth Floor, Los Angeles, CA 90012, Defendant Indio Products, Inc. ("Indio") will and hereby does move the Court for a *Daubert* Motion to Exclude the Expert Report of Hal Poret and the accompanying Survey, and to exclude from trial any testimony, argument, demonstratives, or other evidence relating to the Report and/or Survey. This motion is brought pursuant to Fed. R. Evid. 403, 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

This motion is based upon the Memorandum and accompanying papers in Support of Indio's *Daubert* Motion to Exclude Expert Report and Testimony of Hal Poret and any subsequently filed memorandum, and upon such other matters as may be presented at the time of the hearing.   In sum, the survey conducted by Mr. Poret was misguided in that Mercado Latino, Inc. ("Mercado") and/or its attorneys failed to provide him with sufficient market information on which to conduct a reliable survey.

*First*, the survey tested the *wrong people* as Mr. Poret did not know that the accused candles were ▮▮▮▮▮▮▮ primarily sold in **dollar-type stores** geographically limited to the Southern California region.  Instead, he conducted a national survey over the Internet and only asked about shopping at *other* types of stores, not dollar stores.

*Second*, the survey used the *wrong format* because Mr. Poret was not informed that the candles at issue were not sold in proximity, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Due to the suggestiveness of this survey format, a *Squirt* survey putting products into proximity can only be used for products that are typically sold in proximity (*i.e.*, proximal in time/location) – *i.e.*, the sequential display must approximate actual market conditions. ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1  ████████████████████████████████████████████ The survey was thus

2  a simple matching game divorced from the actual market reality ████████████

3  ████████████████████████████

4      *Third*, the survey used *improper controls,* as Mr. Poret was not informed that

5  the exact same saints are available across a multitude of competitive candles.  Instead

6  of maintaining the same saints across the tested sets of candles, he ████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████ This was

11  particularly problematic when the survey already involved the wrong respondents

12  being taught about the Sanctuary Series trade dress and the demand effect of asking

13  the respondents to match other candles to that product.  ████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████

17      That leads to the *fourth* issue of *irrelevance*: the survey missed the mark and

18  tested for confusion *unrelated to the Asserted Trade Dress*.[1]  Mr. Poret did not control

19  for testing of a *theme* of a church window and allowed the saint images – which are

20  public domain – to dominate the test.  The failure to test for confusion related to the

21  Asserted Trade Dress is evident from ████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████

24      *Yet*, despite the fundamental problems – including the use of a suggestive

25  format and variations in control to steer respondents toward selecting the accused

26  ───────────────────

27  [1] The Asserted Trade Dress is defined in the Second Amended Complaint of plaintiff (DN 26 at ¶¶ 12-13).  It essentially describes a basic prayer candle (tall clear glass

28  jar with a single-color wax and label with a saint image) along with any stained-glass window border in the shape of a cathedral window.

1  candles via the saint images – ████████████████████████

2  ███████████████████████████████████████████████████

3  ███████████████████████      That level of confusion is recognized to

4  evidence an absence of a likelihood of confusion.  ████████████████

5  ███████████████████████████████████████████████████

6  ████████████████████████████████████████████

7          Pursuant to L.R. 7-3, lead Counsel for Indio met and conferred with Counsel

8  for Plaintiff Mercado Latino, Inc. on April 11, 2018 telephonically.

9

10  Dated: May 7, 2018                    Respectfully submitted,

11                                        By:/s/ Linda D. Mettes
                                          Linda D. Mettes
12                                        Rebecca J. Cantor
                                          Kristin L. Murphy
13                                        Anita C. Marinelli
                                          **BROOKS KUSHMAN P.C.**
14                                        1000 Town Center, 22nd Floor
                                          Southfield, MI 48075
15                                        Tel: 248-358-4400/Fax: 248-358-3351
                                          lmettes@brookskushman.com
16
                                          Edward W. Lukas
17                                        **HARRINGTON, FOXX, DUBROW &**
                                          **CANTER, LLP**
18                                        333 South Hope Street, Suite 1000
                                          Los Angeles, California 90071
19                                        Telephone: (213) 489-3222
                                          elukas@kfdclaw.com
20
                                          *Attorneys for Defendant*
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ..................................................................... ii

I.    INTRODUCTION ...................................................................1

II.   THE PORET SURVEY ..........................................................2

III.  LEGAL AUTHORITY ............................................................4

      A.    The Court's Gatekeeper Role under *Daubert* .........................4

      B.    Tenants of Sound Survey Design to Prove Admissibility...................5

IV.   ARGUMENT.........................................................................6

      A.    Survey Respondents were Not Consumers of the Accused Templar Candles that were Sold in Dollar Stores in Southern California...............................................................7

      B.    A *Squirt* Format is Permissible Only When Proximity Exists but Sanctuary Series and Templar Candles are Sold to Distinct Types of Retailers ...............................................8

      C.    The Survey Controls were Manipulated to Artificially Inflate Results by Improperly Varying the Dominant Saint Image...............11

      D.    Confusion Linked to the Asserted Trade Dress was Not Tested.........14

            1.    The Survey at Best Tested for a Stained-Glass <u>Concept</u> ......... 14

            2.    The High Level of Confusion Directed Toward Non-Accused Candles Evidences the Disconnect with the Asserted Trade Dress ........................ 15

      E.    The Survey Shows an Absence of Likelihood of Confusion Despite Flaws.....................................................16

            1.    Respondents Frequently Selected Multiple Candle Lines ........ 16

            2.    The Open-Ended Responses Indicate Most Affirmative Responses ████████████████ ................................. 17

V.    CONCLUSION.....................................................................18

# TABLE OF AUTHORITIES

## Cases

*Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*,
   2013 U.S. Dist. LEXIS 198591 (C.D. Cal. June 21, 2013) ...........................15

*Avery Dennison Corp. v. Sumpton*,
   189 F.3d 868 (9th Cir. 1999)......................................................................8

*Brighton Collectibles, Inc. v. RK Texas Leather MFG*,
   923 F.Supp.2d 1245 (S.D. Cal. 2013) .........................................................12

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
   383 F.3d 110 (3d Cir. 2004)........................................................................7

*ComponentOne, L.L.C. v. ComponentArt, Inc.*,
   2008 U.S. Dist. LEXIS 87066 (W.D. Pa. Oct. 27, 2008)...............................9

*Cumberland Packing v. Monsanto Co.*,
   32 F. Supp. 2d 561 (E.D. N.Y. 1999)......................................................6, 11

*Daubert v. Merrell Dow Pharm.*,
   43 F.3d 1311 (9th Cir. 1995) ..................................................................5, 18

*Dreyfus Fund Inc. v. Royal Bank of Canada*,
   525 F. Supp. 1108 (S.D.N.Y. 1981) .............................................................7

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).....................................................................................5

*Globefill Inc. v. Elements Spirits, Inc.*,
   Civ. No. 2:10-cv-2034.................................................................................2

*Gov't Emples. Ins. Co. v. Google, Inc.*,
   2005 U.S. Dist. LEXIS 18642 (E.D. Va. Aug. 8, 2005)...............................15

*Hansen Bev. Co. v. Cytosport, Inc*,
   2009 U.S. Dist. LEXIS 120508 (C.D. Cal. Nov. 4, 2009)..............................7

*Isle of Capri Casinos, Inc. v. Flynt*,
   2016 U.S. Dist. LEXIS 152203 (C.D. Cal. Nov. 1, 2016)...........................5, 9

*Kargo Glob., Inc. v. Advance Magazine Publrs., Inc.*,
  2007 U.S. Dist. LEXIS 57320 (S.D. N.Y. Aug. 6, 2007) ..................... 11, 15

*Kournikova v. General Media Communications, Inc.*,
  278 F. Supp. 2d 1111 (C.D. Cal. 2003) ......................................................18

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)......................................................................................5

*Leelanau Wine Cellars v. Black & Red*,
  502 F.3d 504 (6th Cir. 2007) ........................................................................7

*Lisa Frank, Inc. v. Impact Int'l, Inc.*,
  799 F. Supp. 980 (D. Ariz. 1992) .................................................................8

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc*,
  2004 U.S. Dist. LEXIS 2485 (S.D. N.Y. 2004)............................................6

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*,
  230 F.Supp.3d 1161 (C.D. Cal. 2017)........................................................3, 8

*Novartis Consumer Health, Inc. v. Johnson & Johnson Merck Consumer Pharms. Co.*,
  129 F. Supp. 2d 351 (D.N.J. 2000)...............................................................11

*Pinterest, Inc. v. Pintrips, Inc.*,
  140 F. Supp. 3d  997 (N.D. Cal. 2015)........................................................17

*Reinsdorf v. Skechers U.S.A.*,
  922 F. Supp. 2d 866 (C.D. Cal. 2013)........................................................5, 8

*Riviana Foods Inc. v. Societe Des Produits Nestle S.A.*,
  1994 U.S. Dist. LEXIS 20267 (S.D. Tex. Dec. 20, 1994) ...........................9

*Sazerac Co. v. Fetzer Vineyards, Inc.*,
  265 F. Supp. 3d 1013 (N.D. Cal. 2017).......................................................10

*Scott Fetzer Co. v. House of Vacuums Inc.*,
  381 F.3d 477 (5th Cir. 2004) .........................................................................9

*Sears, Roebuck & Co. v. Menard*,
  2003 U.S. Dist. LEXIS 951 (N.D. Ill. 2003).................................................5

*Simon Prop. Group L.P. v. MySimon, Inc.*,
    104 F.Supp.2d 1033 (S.D. Ind. 2000)........................................................6, 12

*Squirt Co. v. Seven-Up Co.*,
    628 F.2d 1086 (8th Cir. 1980) ..................................... 1, 2, 5, 8, 9, 11, 14, 16

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 286 (2d Cir. 1999) .......................................................................6

*Stilwell v. Smith & Nephew, Inc.*,
    482 F.3d 1187 (9th Cir. 2007) ....................................................................5

*Sunbeam Corp. v. Equity Indus. Corp.*,
    635 F. Supp. 625 (E.D. Va. 1986) .............................................................12

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D. N.Y. 2010) .......................................................9

*VIP Prods., LLC v. Jack Daniel's Props.*,
    2018 U.S. Dist. LEXIS 14432 (D. Ariz. Jan. 29, 2018)...........................2, 16

*Vista Food Exchange,Inc. v. Vistar Corp.*,
    2005 U.S. Dist. LEXIS 42541 (E.D. N.Y. Sep. 27, 2005) ..........................18

*Watec Co. v. Liu*,
    2002 U.S. Dist. LEXIS 28539 (C.D. Cal. May 21, 2002)............................5

**Other Authorities**

6 McCarthy on Trademarks and Unfair Competition § 32:159 .................................7
6 McCarthy on Trademarks and Unfair Competition § 32:171 .................................8
6 McCarthy on Trademarks and Unfair Competition § 32:175 ...............................17
6 McCarthy on Trademarks and Unfair Competition § 32.189 ...............................16
Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope*
    *of Squirt*, 98 Trademark Rep. 739, 746 (2008).............................................16
*Manual for Complex Litigation, Fourth*, §11.493 ................................................6
*Reference Guide on Survey Research in Reference Manual on*
    *Scientific Evidence*, Federal Judicial Center, 3d ed. (2011).........................11

**Rules**

Fed. R. Evid. 702...........................................................................................4
Fed. Rule Evid. 403........................................................................................18

# I.   INTRODUCTION

Underscoring the weakness of its common law trade dress claim, Plaintiff Mercado Latino, Inc. ("Mercado") provided a scientifically unreliable opinion from Hal Poret concerning a results-driven confusion survey that was nothing more than a memory and picture association test. Incredibly, the Poret survey managed to violate several tenets of sound survey design while at the same time taking a stimuli and question format that numerous courts have held unreliable and biasing it even more. And, yet, despite all the bias and the well-recognized demand effects of the *Squirt* protocol, **the results show an absence of a likelihood of confusion** when confusion toward the non-accused control candles is subtracted.  In fact, the respondents' own words attributed practically no confusion to the Asserted Trade Dress.

Tellingly, the Poret survey exhibited an elevated level of confusion toward *non-accused* candles and, even worse, a troubling level of confusion stemming from the public domain images of the saints.  Mr. Poret was handicapped with poor information about the prayer candle market. His lack of information resulted in a survey that suffers from serious flaws starting with an over-inclusive universe that failed to capture respondents in the right market segment or geography for the accused candles. He did not know that ███████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████

The survey asked the wrong people questions in the wrong way – using a suggestive survey design that is only acceptable for products that appear in proximity. The *Squirt* survey is an unreliable survey design when, as here, the products do not appear in spatial or temporal proximity in the market.  The evidence of a lack of proximity for the typical sale of Templar candles is irrefutable: ████████████ ████████████████████████████████████████████ ███████████████████████████

But, these serious flaws ultimately serve as the backdrop to a manipulated control that artificially increased confusion. The survey used bogus controls that steered respondents toward guessing the "correct" answer – ██████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ only the aspect tested should be varied and interjecting a potent variable will skew results.

Under a well-established body of law, any one of these defects is an independent basis for exclusion.  Collectively, these flaws show that Mercado cannot even come close to carrying its burden to show that the survey is reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). In short, the survey is not based on sufficient data, unreliable and irrelevant because it fails to measure the issue at hand – whether potential purchasers of Indio's Templar candle would be confused for reasons related to the Asserted Trade Dress. The Poret survey does not show a likelihood of confusion and should be excluded under Rule 702 and 403 of the Federal Rules of Evidence.

## II.    THE PORET SURVEY

The "prevailing standard when conducting a likelihood of confusion survey is the *Eveready* survey.  *VIP Prods., LLC v. Jack Daniel's Props*., 2018 U.S. Dist. LEXIS 14432 at *26 (D. Ariz. Jan. 29, 2018).  Whereas the *Eveready* protocol avoids suggestion by *not* first teaching respondents about the plaintiff's trade dress before asking questions about source affiliation,[2] Mr. Poret instead conducted the sequential line-up variation of the *Squirt* survey – which is recognized to be highly suggestive

---

[2] The *Squirt* "aided awareness format" teaches respondents about the trade dress by showing it just before asking about any source affiliation.  Ex A, Decl. of Marinelli at Ex 1, Poret Tr at 66:13-19, 124-125; Ex A-2, *Poret Report in Globefill Inc. v. Elements Spirits, Inc*., Civ. No. 2:10-cv-2034 at 5-7, n.3.  The *Eveready* survey is *unaided* and thus does not suffer from "demand effects," *i.e*., suggestiveness.  *Id.*; Ex B, Decl. of Hollander, Ex 1, Expert Report of Hollander at ¶ 19.

and thus limited to situations where the products at issue are sold proximally in the market, *i.e.*, viewed at same locations and close together in time.[3]

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████ ██████

███████████████████████████████████████████████

██████████████████████████████████████████ ██████

█████████

---

[3] *Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F.Supp.3d 1161, 1175 (C.D. Cal. 2017).

[4] This failed to obtain potential purchasers of prayer candles as many candles bear "religious images" and "icon" is vague, as even Mr. Poret could not explain "icon" meant. Ex A-1, Poret Tr. at 26:4-6. Many consumers purchase candles with **crosses** or religious images but are unfamiliar with the prayer candles here of Hispanic origin.

[5] Ex A-3 at 49; A-1 at 61:2-18; 111:13-22.

[6] ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



### III.   LEGAL AUTHORITY

**A. The Court's Gatekeeper Role under *Daubert***

     The privilege granted to an expert witness to provide opinion testimony is contingent upon objectively substantiating that the opinions are reliable to prove what the expert says is proven. The admissibility of expert testimony is governed by Fed. R. Evid. 702 and the principles set forth by the Supreme Court in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).  Rule 702 provides that scientific knowledge may be admissible "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

     Under *Daubert*, Rule 702 requires a trial court to act as a *gatekeeper* to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S at 582. "A court may exclude testimony that falls short of achieving either end." *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187,

---

1192 (9th Cir. 2007). The burden of establishing the admissibility of expert testimony is on the proponent. *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1318 n. 10 (9th Cir. 1995) ("*Daubert II*").  A trial court has broad latitude in assessing reliability of an expert's testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).  Relevant expert testimony is that which "logically advances a material aspect of the proposing party's case."  *Daubert II*, 43 F.3d at 1315.

Without a reliable foundation for the expert's methodology, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). A court may conclude that "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## B.  Tenants of Sound Survey Design to Prove Admissibility

Courts routinely criticize and exclude surveys for failing to replicate the actual market conditions confronted by potential consumers. *See Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (excluding survey in part because "no indication that the survey population had any relationship to the relevant population of [] consumers"); *Watec Co. v. Liu*, 2002 U.S. Dist. LEXIS 28539 (C.D. Cal. May 21, 2002); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.,* 198 F. Supp. 2d 474, 484 (S.D. N.Y. 2002); *Sears, Roebuck & Co. v. Menard,* 2003 U.S. Dist. LEXIS 951, *10 (N.D. Ill. 2003).

"[T]he *Squirt* protocol is most appropriate where a product with a weak mark is sold ***in close proximity*** to the alleged infringer in the marketplace." *Isle of Capri Casinos, Inc. v. Flynt*, 2016 U.S. Dist. LEXIS 152203 at *19 (C.D. Cal. Nov. 1, 2016) (emphasis added). "A *Squirt* format should thus not be used where tested brands do not proximately appear in the market" so as not to "give a weak mark artificial 'reach' that it does not intrinsically possess." *Id.*  In addition, use of a control stimulus – that is as similar as possible to the accused product – is necessary to account for obvious alternative explanations to assess causation." *Cumberland Packing v. Monsanto Co.,*

32 F. Supp. 2d 561, 574 (E.D. N.Y. 1999); *Simon Prop. Group L.P. v. MySimon, Inc*., 104 F.Supp.2d 1033, 1045 (S.D. Ind. 2000). Without a proper control, a survey can be reduced to "a meaningless word association or memory exercise." *Id.*

All surveys should satisfy the following requirements: (1) a properly defined universe, (2) a representative sample of that universe, (3) questions that are framed in a clear, precise and non-leading manner, (4) sound interview procedures by competent interviewers with no knowledge of the survey purpose, (5) accurate data reporting, (6) data analysis according to statistical principles, and (7) objectivity. *Manual for Complex Litigation, Fourth,* §11.493. "The failure to satisfy one of these criteria may result in exclusion of the survey." *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc*, 2004 U.S. Dist. LEXIS 2485, *23 (S.D. N.Y. 2004).

## IV.   ARGUMENT

The Poret survey is a "merely transparent path to a desired but artificial result, one driven by leading and suggestive questions, distortions of consumer experiences and without obvious controls." *See Simon*, 104 F.Supp.2d at 1052; *Starter Corp. v. Converse, Inc*., 170 F.3d 286, 297 (2d Cir. 1999) (no abuse of discretion excluding survey that was "little more than a memory test"). The Poret survey was riddled with major flaws: *e.g*., 1) an overbroad universe that lacked relevant prayer candle consumers; 2) a suggestive test format inconsistent with the market for relevant prayer candles; and 3) a biased control that varied control stimuli but not tested candles. These errors alone obliterate any reliability and the cumulative effect relegates the survey to junk science. The survey utterly failed to test for confusion relating to the trade dress at issue. █████████████████████████

██████████████████████████████████████████████

████████. Even so, a correct calculation – only counting respondents who identified the accused candles but not either of the control candles – l████████████████████

██████ That result indicates a lack of likelihood of confusion before even considering that the survey suggested the desired answer to the wrong set of people.

**A.   Survey Respondents were Not Consumers of the Accused Templar Candles that were Sold in Dollar Stores in Southern California**

The Poret Survey failed to target respondents who were potential buyers of the Templar candle.  "The first step in designing a survey" to gauge confusion "is to determine the 'universe' to be studied," that is, the segment of the population whose perceptions and state of mind are relevant in this case. 6 McCarthy on Trademarks, § 32:159.   This first step is crucial—even asking "proper questions" in a "proper manner" is likely to render irrelevant results if the survey probes the "wrong persons."[7]  *Id.*  Where a senior user asserts infringement by a junior user, "the proper universe to survey is composed of **potential buyers of the junior user's goods**." *Hansen Bev. Co. v. Cytosport, Inc,* 2009 U.S. Dist. LEXIS 120508 at *39 (C.D. Cal. Nov. 4, 2009) (emphasis added); 6 McCarthy on Trademarks § 32:159.

Thus, the proper universe is constrained to potential buyers of the accused Templar candle – which is prayer candle consumers at dollar stores who reside in the Southern California region.[8]  Ex B-1 at ¶¶ 16, 38; DN 131-8, Bakhtiari Decl. at ¶¶ 11-12, 33.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex A-3 at 17; Ex B-1 at ¶ 36.  The geographic and marketplace scope of the Poret survey did not even approach the necessary approximation of Templar's buyers.  *See Leelanau Wine Cellars v. Black & Red*, 502 F.3d 504, 518-19 (6th Cir. 2007) (affirming exclusion of survey that did not account for purchasers of moderately priced wines that bought wine at defendant's specific distribution outlets).

---

[7] "Flaws in a study's universe quite seriously undermine the probative value of the study, because to be probative and meaningful . . .  surveys . . . must rely upon responses by potential consumers of the products in question." *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (S.D. N.Y. 1981); *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004).

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Moreover, the Squirt survey format – which shows respondents Mercado's Sanctuary Series candles just before showing the accused Templar candles – requires potential customers that shop for ███████████████████████ at **both** dollar stores ████████████ and mass merchandisers/grocery stores ████████ ██████ at a closely proximate time. Ex B-1 at ¶ 40. █████████████████████ █████████████████████████████████ ██████████████████████████ ███████████████████████████████████████████ Ex B-1 at ¶ 44. ████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ Ex B-1 at ¶¶ 44-45.

Thus, the Poret survey targeted an entirely inapplicable universe of respondents rendering the survey inadmissible. *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d at 878; *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 879 (9th Cir. 1999) (rejecting reliance on survey that failed to address appropriate population sample.)   In turn, the representative sample of perhaps two respondents was too low for reliability.  *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 994 (D. Ariz. 1992) (survey given little weight with only 32 respondents); 6 McCarthy § 32:171 ("Conducting a survey with a number of respondents too small to justify a reasonable extrapolation to the target group at large will lessen the weight of the survey.")

**B.   A *Squirt* Format is Permissible Only When Proximity Exists but Sanctuary Series and Templar Candles are Sold to Distinct Types of Retailers**

Poret used a Sequential Line Up survey, which is a variation of the "*Squirt*" methodology used in *Squirt Co. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980). "The *Squirt* design is most appropriate where a product with a **weak mark** is sold **in close proximity to** the alleged infringer in the marketplace." *Moroccanoil,* 230 F.Supp.3d at 1175 (emphasis added).  Courts have criticized *Squirt* surveys for utilizing closed-ended questions that can lead participants to the desired answer generating demand effects.  *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d

477, 487-88 (5th Cir. 2004) (*Squirt* survey pushes "survey participants to search for any connection, no matter how attenuated . . . instead of permitting participants to make their own associations"); *Riviana Foods Inc. v. Societe Des Produits Nestle S.A.*, 1994 U.S. Dist. LEXIS 20267 at *4 (S.D. Tex. Dec. 20, 1994).  A *Squirt* survey is only appropriate where the products appear proximate in the marketplace – *i.e.*, the sequential display approximates actual market conditions.[9] *Moroccanoil,* 230 F.Supp.3d at 1175; *Isle of Capri Casinos,* 2016 U.S. Dist. LEXIS 152203 at *19.

Mr. Poret did not replicate the real-world market in which consumers encountered the accused Templar candles.[10]  Instead, he created an artificial situation in which



9 Mr. Poret assumed that the parties' products are "marketed to the same prospective consumers" ███████████████████████████████████████████ ██████████ but he recognized that the *Squirt* format required that consumers typically are "exposed in sequence to both parties products in the marketplace" and that **"consumers would be reasonably likely to encounter both in close proximity in the marketplace."**  Ex A-3 at 8.

10 A survey that is "divergent from the conditions that potential purchasers encounter in the parties' marketplace" does nothing more than measure the respondents' associations devoid of context. *ComponentOne, L.L.C. v. ComponentArt, Inc*., 2008 U.S. Dist. LEXIS 87066 at *77-81 (W.D. Pa. Oct. 27, 2008); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 238 (S.D. N.Y. 2010) (excluding survey that failed to replicate the way consumers encountered the parties' products in the marketplace.").

1

2

3

4

5

6 ████████████████████████████████████ (Ex A-4 at 22:21-

23; Ex A-6 at 44:7-11; Ex A-5 at ¶ 14.)  Yet, Mr. Poret was uninformed and merely

assumed Templar availability at "a variety of places" and "ordinarily available retail

channels." Ex A-1 at 28:2-13; 28:20-29:3; 53:4-54:4; 54:13-21.  He could not

identify a single store where Templar candles were sold.  Ex A-1 at 36:23-25; 55:4-

10. ████████████████████████████████████

████████████████████████████ Ex A-1 at 66:5-9.

Mr. Poret knew nothing of the pricing and locations of where the candles were sold

and nothing of Mercado's ████ Carisma candles that was actually sold to dollar

stores.  Ex A-1 at 29:12-31:18, 33:3-25, 53:4-54:4, 54:13-21; 65:16-66:19, 127:16-

128:20, 133:24-135:16.

Though Mr. Poret was not informed of where Templar and Sanctuary Series

candles were sold, he selected a survey format for which it was prerequisite that

consumers typically examine the plaintiff's product in the course of shopping for the

defendant's.[11]  Mr. Poret opined in the past about the inappropriateness of a line-up

survey when products are not proximate – including the danger of a survey devolving

into forcing a "match" for reasons other than confusion as to trade dress.  A-2 at 9,

23-24.  The survey should be excluded as unreliable:  Mercado has not and cannot

---

[11] Further compromising the replication of the marketplace, the Poret survey also forced respondents to view the Sanctuary Series candles for ten seconds, which further removes the survey from any real-world marketplace comparability. Ex A-3 at 15; Ex A-1 at 67:3-8, 68:8-12.  Forcing respondents to look at stimuli for a minimum amount of time creates a situation "not terribly likely to happen in the marketplace" and "demand effects" that leads "respondents to pick the expected answer and renders the survey's results completely unreliable." *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1026 (N.D. Cal. 2017).

offer "data or other evidence to support the proposition that prospective consumers were likely to encounter [the Asserted Trade Dress] a short time after seeing [Templar candles]." *Kargo Glob., Inc. v. Advance Magazine Publrs., Inc.*, 2007 U.S. Dist. LEXIS 57320 at *21-22 (S.D. N.Y. Aug. 6, 2007) (excluding survey for failure to replicate the marketplace and leading questions).  The necessary foundation evidence for use of a *Squirt* Line-Up was Mercado's burden and Mercado failed to meet that burden.

## C.  The Survey Controls were Manipulated to Artificially Inflate Results by Improperly Varying the Dominant Saint Image

The "appropriate use of controls is critical" to "sufficiently account for factors legally irrelevant to the requisite confusion." *Cumberland*, 32 F. Supp. 2d at 574-75; Shari S. Diamond, *Reference Guide on Survey Research in Reference Manual on Scientific Evidence*, Federal Judicial Center, 3d ed. (2011), at 397-401. A control "provides a measure of the degree to which respondents are likely to give an answer . . . not as a result of the [mark at issue], but because of other factors, such as the survey's questions, the survey's procedures . . . or some other potential influence on a respondent's answer such as pre-existing beliefs." *Novartis Consumer Health, Inc. v. Johnson & Johnson Merck Consumer Pharms. Co.*, 129 F. Supp. 2d 351, 365 n. 10 (D.N.J. 2000).  "In designing a control group study, the expert should select a stimulus for the control group that shares *as many characteristics with the experimental stimulus as possible*, with the key exception of the characteristics whose influence is being assessed." *See* Diamond, at 399 (emphasis added).





Altering the most prominent feature of the control is a prime ground for exclusion.[12]  In *Brighton Collectibles, Inc. v. RK Texas Leather MFG*, 923 F.Supp.2d 1245, 1257-58 (S.D. Cal. 2013), the court excluded a survey that included a "line-up

---

[12] *See Sunbeam Corp. v. Equity Indus. Corp.*, 635 F. Supp. 625, 634 (E.D. Va. 1986) (rejecting survey when accused product "stood out like a bearded man in a lineup with four clean-shaven men"), *aff'd* 811 F.2d 1505 (4th Cir. 1987); *Simon Prop. Grp. L.P. v. my-Simon, Inc.*, 104 F. Supp. 2d 1033, 1051 (S.D. Ind. 2000) (rejecting survey when format tested "nothing more than the memory and common sense of a respondent" but nothing relevant about consumer confusion).

in which only one bag share[d] the most prominent and eye-catching features — two colors and silver hearts — [and this] improperly suggested to the participants that [d]efendants' bag was the 'correct' answer." *Id*. at 1257. ████████████

████████████████████████████████

████████████████████████

     Mr. Poret testified that he tried to keep the saint images consistent and selected the best saints sharing similarities from the array that Mercado provided him.[13]  Ex A-1 at 61:19-63:3; 97-7:100:25.  However, both the Eternalux brand and St. Jude Candle Company (as well as many other retailers) carry the same religious figures as the survey's display of Mercado's Sanctuary Series candles, as shown above.  Ex B-1 at ¶ 57, Appx F.



| Sanctuary Series | Covemex/ Dakar USA | Star Candle Company | Bright Glow Candle Company | St. Jude Candle Company | Templar (prior) | Reed Candle Company | Eternalux (prior) | Eternalux (current) | Templar (current) |

| Sanctuary Series | Bright Glow Candle Company | Reed Candle Company (Etsy) | Brilux | Eternalux (prior) | St. Jude Candle Company | Reed Candle Company | Star Candle Company | Eternalux (current) | Templar (current) |

---

[13] Mr. Poret testified to the importance that the saint images be as similar as possible across the tested and control candles.  Ex A-1 at 98:1-100:6.  He apparently was under the impression that the saint images varied across manufacturers as he indicated that he "obviously don't control what specific saints are put on the different candles…"  Ex A-1 at 61:23-25.  He could only pick the closest ones from the "array provided by Mercado."  Ex A-1 at 63:1-3, 15:6-19.

Thus, the stimuli presentation and control were concocted to suggest to the respondents the "correct" response by matching the images of the religious figures, in an attempt to lead more respondents to select Indio's Templar candles.

**D.  Confusion Linked to the Asserted Trade Dress was Not Tested**

**1.  The Survey at Best Tested for a Stained-Glass <u>Concept</u>**

Mercado defined the Asserted Trade Dress as a basic prayer candle (tall clear glass jar with a single-color wax and label with a saint image) along with any stained-glass window border in the shape of a cathedral window.  DN 26 at ¶¶ 12-13.  In addition to the saint images, the display of three prayer candles (which is unlike the real world) confused many of the respondents █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  Ex B-1 at Appx G-H.  Moreover, the survey tested the **<u>concept</u>** of stained glass concept was tested as opposed to the Asserted Trade Dress.  Mr. Poret has acknowledged that a Lineup survey is "suggestive" and causes respondents to make superficial connection between two products that "both reference [a] concept or theme."  Ex A-2 at 9, 18-21, Mr. Poret did not control for testing of a theme of a church window and allowed the saint images – which are public domain – to dominate the test.  Ex B-1 at ¶ 56.  The failure to test for confusion related to the Asserted Trade Dress is evident from the respondents' verbatim comments but also evident from the high confusion measured for non-accused candles without the stained-glass window border of the Asserted Trade Dress.

The Poret survey was uniquely concocted to elicit a desired result – which is a well-recognized problem with the suggestive *Squirt* format and resulted in limiting that format to situations where the products at issue appear proximately in the market.  It is indisputable that the Sanctuary Series candles of Mercado are not sold to the dollar-type stores where the accused Templar candles were sold.  Using this survey

format with demand effects, the stimuli presentation was devised to suggest to the respondents the "correct" response by matching the stained-glass **concept** and the predominant visual element: the public domain images of the saints or religious figures.

### 2. The High Level of Confusion Directed Toward Non-Accused Candles Evidences the Disconnect with the Asserted Trade Dress

A failure in "keeping the other elements as constant as possible" in the control prevents a survey from measuring of relevant confusion. *Gov't Emples. Ins. Co. v. Google, Inc*., 2005 U.S. Dist. LEXIS 18642 at *20-23 (E.D. Va. Aug. 8, 2005). A high level of confusion for the control group evidences survey unreliability. *Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc*., 2013 U.S. Dist. LEXIS 198591 at *11 (C.D. Cal. June 21, 2013) (excluding survey with 18% control confusion). "[I]n the best of all possible worlds, it would not be desirable for a control to yield confusion estimates that exceeded 10 percent. If it did, the control itself would begin to reach an actionable level of confusion and its utility as a control thereby compromised." *Acad. of Motion Pictures,* 2013 U.S. Dist. LEXIS 198591 at *12 (citing Jacob Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 TRADEMARK REP. 890, 932 (2002)).

The Poret Survey resulted ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████. An explanation for this high rate of confusion for non-accused candles is that the "[s]urvey was designed (successfully) to lead its respondents to infer that a connection existed between the parties' products." *Kargo Glob., Inc.*, 2007 U.S. Dist. LEXIS 57320 at *28. A high confusion rate among the control group "is strong if not dispositive proof that the survey was designed to lead respondents to conclude that the parties' products were related." *Id.* The suggestiveness and unreliability of the Poret Survey is even higher considering the high control confusion despite the variation of saint images biased toward the accused candles.

**E.**     **The Survey Shows an Absence of Likelihood of Confusion Despite Flaws**

    **1.**  **Respondents Frequently Selected Multiple Candle Lines**

███████████████████████████████████████████████

█████████████████████████████████████████████████████The only respondents who could reasonably count towards confusion are those that selected **only** the accused Templar candle.   Ex B-1 at ¶ 70.   ███████

███████████████████████████████████████████████████████

██████████████████████████████████████████████ Ex B-1 at ¶ 70.   ██████

██████████████████████████████████████████████████

█████████ Ex B-1 at ¶ 72.   ██████████████████

████████████████████████████████████████████████

████████████████████████████ Ex B-1 at ¶ 73.

    Courts require survey levels of at least 15% to be indicative of a likelihood of confusion.[14]   And, levels at or below 10 percent are indicative that a likelihood of confusion does not exist.  Further exacerbating the low levels of confusion, a *Squirt* sequential lineup survey requires even higher levels of confusion to be indicative of a likelihood of confusion.  Ex B-1 ¶¶ 72-73; Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 746 (2008) ("[A] level above 10 percent should be required from a *Squirt* format.").  "When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely." McCarthy § 32.189. Given that the Poret Survey utilized the beleaguered *Squirt* format, confusion above 10% would have been required to evidence confusion. The low levels of confusion present thus indicate a lack of confusion.   ██████████████████████

████████████████████████████████████████████████

---

[14] *VIP Products*, 2018 LEXIS 14432 at *28 (crediting 29% *Eveready* confusion level as double the 15% threshold necessary to be indicative of a likelihood of confusion).

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ██████████████████████████

### 2. The Open-Ended Responses Indicate Most Affirmative Responses Were Related to the Public Domain Images or Otherwise Irrelevant

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ██████████████████████████

11 ████████████████████████████████████████████████████████

Mr. Poret admitted that he did not rely on the responses and argued that the control would address confusion not related to the trade dress.  Ex A-1 at 90:2:1; Ex B-1 at ¶¶29, 62.  First, Mr. Poret has referenced open-ended responses in his critique of the surveys of other experts.  Ex A-2 at 28-29.  "Often, an examination of the respondents' verbatim *responses to the 'why' question are the most illuminating and probative part of a survey*, for they provide a window into consumer thought processes in a way that mere statistical data cannot." 6 McCarthy on Trademarks and Unfair Competition § 32:175 (emphasis added).  Where the open-ended responses provide explanation for confusion that is unrelated to the desired target, the survey is inadmissible to show confusion.  *Pinterest, Inc. v. Pintrips, Inc*., 140 F. Supp. 3d 997, 1016 (N.D. Cal. 2015) (excluding survey where open-ended answers of respondents indicated no confusion of relevant mark but rather fair use of word "pin").

A control ███████████████████████████████████████████ ██████████████████████████ is inadequate to address respondents who selected the accused Templar candles for reasons that did not involve the Asserted Trade Dress.  Ex B-1 at ¶ 62. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ In the Test

1  Group, ████████████████████████████████████████████████████

2  ███████████████████ Ex B-1 at ¶ 64.  An ███████████████████████

3  ███████████████████████████████████████████████████████████████

4  ██████████████████████████ Ex B-1 at ¶ 64, Appx G-H.  ██████████

5  ███████████████████████████████████████████████████████████████

6  ████████████████████████████████ Ex B-1 at ¶ 65.  These open-ended

7  responses show that confusion was not in any way associated with the purported

8  protectable aspect – the stained-glass window border – of the trade dress.

9       Relevant expert testimony is that which "logically advances a material aspect

10 of the proposing party's case."  *Daubert II*, 43 F.3d at 1315.  Here, the survey tested

11 the wrong thing – failing to obtain any information from relevant consumers about

12 the Asserted Trade Dress – and thus is irrelevant.  Further, the low level of confusion

13 ██████████ supports an absence of a likelihood of confusion and thus does not advance

14 Mercado's position otherwise.  The survey is not just unreliable but irrelevant.[15]

## V.    CONCLUSION

16      For the foregoing reasons, Indio respectfully requests that this Court rule that

17 the Poret Survey is inadmissible as irrelevant and unreliable under *Daubert*, as well

18 as misleading and prejudicial under Fed. Rule Evid. 403.  The survey uses an

19 unreliable methodology (*Squirt* format without proximity foundation, universe not

20 direct to prospective consumers of accused candles, and improper control varying

21 saint images) and is not based on sufficient data (regarding the tiered/non-proximate

22 marketplace, competitive candles, and consumers for the accused Templar candles).

---

[15] Weak surveys also cannot preclude summary judgment that is otherwise warranted. *See, e.g.*, *Kournikova v. General Media Communications, Inc*., 278 F. Supp. 2d 1111, 1125-26 (C.D. Cal. 2003) (fatally flawed survey inadmissible and insufficient to raise triable issue of fact); *Vista Food Exchange,Inc. v. Vistar Corp*., 2005 U.S. Dist. LEXIS 42541 at *22-23 (E.D. N.Y. Sep. 27, 2005) (excluding survey but, if admissible, affording it "*de minimus*" weight and "insufficient to raise a triable issue of fact on the likelihood of consumer confusion.").

Dated:  May 7, 2018

Respectfully submitted,

By: /s/ Linda D. Mettes
Linda D. Mettes
Rebecca J. Cantor
Kristin L. Murphy
Anita C. Marinelli
**BROOKS KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, MI 48075
Tel: 248-358-4400 / Fax: 248-358-3351
lmettes@brookskushman.com
rcantor@brookskushman.com

Edward W. Lukas
**HARRINGTON, FOXX, DUBROW & CANTER, LLP**
333 South Hope Street, Suite 1000
Los Angeles, California 90071
Telephone: (213) 489-3222
elukas@kfdclaw.com

*Attorneys for Defendant*