JS-6

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MERCADO LATINO, INC. dba CONTINENTAL CANDLE COMPANY, | ) ) ) | Case No. CV 13-01027 DDP (RNBx) |
| Plaintiff, | ) ) | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| INDIO PRODUCTS, INC., a California corporation, | ) ) ) | [Dkt. No.128] |
| Defendants. | ) ) ) ) | |

_____  )

Presently before the court is Defendant Indio Products, Inc.

("Indio")'s Motion for Summary Judgment. Having considered the

submissions of the parties and heard oral argument, the court

grants the motion and adopts the following Order.

**I.  Background**

A.  Factual History

Plaintiff Mercado Latino, Inc. ("Mercado") began manufacturing

candles in 1991. Mercado is headquartered in Southern California,

which is its largest market, but also sells products nationwide.

Mercado sells three tiers of prayer candles. Sales of Mercado's

highest-priced "Sanctuary Series" candles run in the millions

annually, as they have since the launch of the product in 1991. Mercado also sells the "Carisma" line of candles, its lower-tier candles that are sold at dollar-type stores (e.g. 99 Cents Only). Customers for Mercado's Sanctuary Series candles include Target, Walmart, and other big chains, as well as independent markets and boutiques.

Defendant Indio Products, Inc. ("Indio") also manufactures and sells multiple lines of prayer candles, including the allegedly infringing Templar line and the non-accused, higher-end Eternalux line, which is sold at a higher price point than the Templar line. Indio began selling the Templar line of candles in 2012. Indio has not sold the Eternalux and Templar candles to the same stores because the two lines serve different prayer candle sub-markets. Templar candles are generally sold to dollar-type stores, with 99 Cents Only stores accounting for 80% of all Templar candle sales.

Some of Mercado's Sanctuary Series candles bear the Asserted Sanctuary Series Trade Dress ("ATD"), which is comprised of "a clear cylindrical container that is approximately 2.25 x 2.25 x 8.0 inches in length, width and height, filled with a solid, single color wax, the clear cylindrical container has an opaque die-cut label with two opposite sides – a 'front' and 'back'. The front side of the die-cut label has a silhouette outlined by a black border with a top portion that tapers together and forms a pointed tip that resembles a 'bullet' shape, with segments of shapes in varying and alternating sizes and colors, similar to a stained glass window. Placed over that label is a depiction of a saint or other religious icon. Directly beneath the depiction of the saint or religious icon, (sic) is a separate segment on the label that

resembles a scroll with the name of the saint or religious icon."
(SAC at ¶12.)  Some Sanctuary series candles, however, do not bear
the Asserted Trade Dress.  Indeed, some Sanctuary Series candles
bear no label at all.[1]  Indio's Templar candles have the same
dimensions as Sanctuary Series candles, and are also in a clear
cylindrical glass jar with an opaque label bearing an image of a
religious figure and religious décor and prayers.

B.  Procedural History

Mercado's initial Complaint alleged causes of action for
copyright infringement, trade dress infringement, and other claims,
as did Mercado's First Amended Complaint ("FAC").  The FAC alleged
trade dress featuring "the unique combination of the following
design elements: a depiction of a saint or religious icon, with a
border that appears to be a 'bullet' shape in the style of a
stained glass window and the name of the saint or the religious
icon underneath the depiction."  (FAC ¶ 21.)  The SAC's allegations
regarding trade dress are more extensive, as set forth above.

Indio moved for judgment on the pleadings.  (Dkt. 79.)  This
Court denied the motion, concluding that (1) Mercado's SAC alleged
the ATD with sufficient specificity, (2) although the SAC asserts a
product design claim rather than a packaging claim, a question of
fact remained regarding whether the ATD had acquired secondary
meaning, (3) factual questions remained with respect to
functionality, and (4) questions of fact remained regarding

---

[1] Other candles, such as the "Lucky Lottery" candle, are not
part of the Sanctuary Series "line," and do not bear the ATD, but
were included in a Sanctuary Series catalog.

Mercado's adequately-pleaded likelihood of confusion allegations.
(Dkt. 95.)  Indio now moves for summary judgment on all claims.

**II.  Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986).  If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.  Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party," and material facts are those "that might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. <u>Carmen v. San Francisco Sch. Dist</u>., 237 F.3d 1026, 1031 (9th Cir.2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." <u>Id.</u>

**III.    Discussion**

A.    The Product Design "Issue"

As an initial matter, Plaintiff argues that this Court's prior conclusion regarding Plaintiff's product design claim, as opposed to a packaging claim, was merely "passing dicta" and a "passing comment." (Opposition at 4:1, 5.) Plaintiff further asserts that, notwithstanding any "inelegancies" in its pleadings, it "has always preserved that it viewed and intended to assert its Trade Dress as a product packaging claim, [and] clarifies that it does not intend to 'expand' its present claim of trade dress 'to the *candle* itself,' but rather, only the enveloping label or packaging." (Opp. at 4:12-15; 6:25.) This claim is untenable.[2]

_____

[2] The court also notes that Plaintiff's Opposition violates
(continued...)

5

First, this Court's discussion of the product design issue was hardly a "passing comment." As stated in the court's Order Denying Defendant's Motion for Judgment on the pleadings, "The distinction [between product design and product packaging] is important because product design trade dress can never be inherently distinctive, and therefore always requires a showing of secondary meaning to support a claim of infringement." (Dkt. 95 at 6.) This Court further explained that Plaintiff's ATD could not possibly be considered a packaging claim, given that the ATD includes essential physical aspects such as a cylindrical container and solid, single-colored wax. (Dkt. 95 at 7.)

Second, Plaintiff's characterization of its product design allegations as mere "inelegancies" of a pleading intended to assert a packaging claim strains belief. Plaintiff's decision to expand its claimed trade dress to include product design features appears to have been the product of a deliberate decision, as evinced by the differences between the Second Amended Complaint's comprehensive description of the ATD and the First Amended Complaint's comparatively limited trade dress allegations. Indeed, the SAC, unlike the FAC, specifically highlights "clear 2.25x2.25.8 cylindrical container" and "filled with solid color wax" as infringing elements of Indio's trade dress. (SAC ¶ 23.) Third, and furthermore, Plaintiff never sought reconsideration of this Court's product design determination, nor sought leave to amend the SAC's trade dress allegations. Plaintiff's belated "request" for

---

[2](...continued)
several of the local rules of this district. <u>See</u> C.D. Cal. L.R. 7-9, 11-3.1.1, 11-3.6.

leave to amend, such as it is, made in passing within Plaintiff's

opposition to the instant motion, is denied.  (Opp. at 7:3-5.)

B.   Secondary Meaning

Trade dress is the "total image of a product, including

features such as size, shape, color, texture, and graphics[.]"

Millennium Labs., Inc. v. Ameritox, Ltd., 817 F.3d 1123, 1126 (9th

Cir. 2016) (internal quotation and citations omitted).  A plaintiff

bringing a trade dress claim must prove "(1) that its claimed dress

is nonfunctional; (2) that its claimed dress serves a

source-identifying role[,] either because it is inherently

distinctive or has acquired secondary meaning; and (3) that the

defendant's product . . . creates a likelihood of consumer

confusion."  Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d

1252, 1258 (9th Cir. 2001).  As discussed above, because this is a

product design case, Plaintiff must prove that the ATD has acquired

secondary meaning. See Wal-Mart Stores, Inc. v. Samara Bros., Inc.,

529 U.S. 205, 216 (2000).

"A product's trade dress acquires secondary meaning when the

purchasing public associates the dress with a single producer or

source rather than just the product itself."  First Brands Corp. v.

Fred Meyer, Inc., 809 F.2d 1378, 1383 (9th Cir. 1987).  "Secondary

meaning can be established in many ways, including (but not limited

to) direct consumer testimony; survey evidence; exclusivity,

manner, and length of use of a mark; amount and manner of

advertising; amount of sales and number of customers; established

place in the market; and proof of intentional copying by the

defendant."  Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns,

Inc., 198 F.3d 1143, 1151 (9th Cir.1999).

7

Indio argues that Plaintiff cannot point to sufficient
evidence to create a triable issue regarding secondary meaning.
The most persuasive evidence of secondary meaning is an expert
survey of purchasers. <u>Vision Sports, Inc. v. Melville Corp.</u>, 888
F.2d 609, 615 (9th Cir. 1989). Plaintiff asserts, without any
citation to the record, that it conducted a "consumer survey, which
provides compelling evidence" of secondary meaning. (Opp. at
11:17-18.) As Plaintiff acknowledged at argument, however, the
report to which Plaintiff refers did not attempt to gauge whether
consumers associate the trade dress with a single source. Rather,
the survey was designed "to test whether the appearance of the
Indio Templar candles creates a likelihood of confusion to the
Sanctuary Series trade dress." (Declaration of Hal Poret in
support of Opposition, Ex. A at 4.) Although some evidence, such
as evidence of actual confusion, might bear on both likelihood of
confusion and secondary meaning, Plaintiff has cited no authority
for the proposition that a survey geared toward consumer confusion
can be used to demonstrate secondary meaning. <u>See Transgo, Inc. v.
Ajac Transmission Parts Corp.</u>, 768 F.2d 1001, 1015 (9th Cir. 1985).

Plaintiff also claims that it has other direct evidence of
secondary meaning, pointing to the declaration of Kirk Zehnder,
Plaintiff's Vice President of Business Development. Zehnder
conclusorily asserts that "consumers have come to associate our . .
. trade dress with us as a uniform source . . . ." (Zehnder Decl.
¶ 26.) Although Zehnder also states that "dozens if not hundreds"
of consumers contact Plaintiff every year to ask for Sanctuary
Series products, that fact is insufficient to create a triable
issue regarding secondary meaning, as not all Sanctuary Series

products bear the Asserted Trade Dress.  Furthermore, none of the consumer inquiries attached to Zehnder's declaration, even those asking for Sanctuary Series candles by name, identify the ATD. (Declaration of Janice Marinelli, Ex. A1 at 50:17-51:1, 91:9-19; Ex. A2 at 40-41; 72; Zehnder Decl., Ex. 14.)  Indeed, some of the consumer inquiries cited by Zehnder explicitly ask for candles that do <u>not</u> bear the trade dress.[3] (<u>See</u>, e.g., Zehnder Decl., Ex. 14 at 79 ("I am looking for the White candles you make[.] Just the plain glass.") There is, therefore, no direct evidence that the ATD has acquired secondary meaning.

Indirect evidence, such as evidence of sales, advertising, and exclusivity of use, may also be used to prove secondary meaning. <u>Filipino Yellow Pages</u>, 198 F.3d at 1151.  The focus, however, must be on the effectiveness of the plaintiff's efforts.  <u>First Brands Corp. v. Fred Meyer, Inc.</u>, 809 F.2d 1378, 1383 (9th Cir. 1987). Plaintiff first argues that it has been using the ATD exclusively since 1991.  (Opp. at 12:8-11.)  The evidence Plaintiff cites, however, does not support that assertion.  The portion of the declaration of Mercado Vice President Richard Rodriguez to which Plaintiff cites makes no reference to length of use or exclusivity. (Declaration of Richard Rodriguez in opposition to motion, ¶ 10.) Although Rodriguez does elsewhere state that Mercado began selling Sanctuary Series products in 1991 and has done so continuously since then, there is no indication of when Sanctuary Series products began featuring the ATD, what proportion of the Sanctuary

---

[3] Furthermore, Zehnder testified that the white Sanctuary Series, <u>with no label</u>, is Mercado's top selling candle.  (Marinelli Decl., Ex. 2 at 73.)

Series products bore the ATD, or whether any use of the ATD was exclusive. (See Rodriguez Decl., ¶ 64.) The only other evidence cited by Plaintiff is a portion of the Zehnder declaration, which says no different, and indeed refers back to the Rodriguez declaration. (Zehnder Decl. ¶ 25.) No reasonable trier of fact could rely on this evidence to find either length or exclusivity of use of the Asserted Trade Dress.

Mercado next argues, again largely without citation to the record, that it has produced evidence of marketing and promotional efforts sufficient to create a triable issue as to secondary meaning. (Opp. at 12.) Evidence of advertising activities can indeed be relevant, provided that the advertising features the trade dress itself and is extensive enough to effectively create an association with the advertiser's product. See Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1146 (9th Cir. 2009); First Brands, 809 F.2d at 1383; see also Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 824 (9th Cir. 1993) ("While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it."). Here, however Plaintiff's own evidence establishes that Plaintiff never itself undertook any advertising efforts. Instead, Plaintiff used "advertising allocation," or an allowance to retailers who would themselves promote and advertise the "Sanctuary Series line."[4] (Rodriguez Decl., ¶ 26). Although Plaintiff's

---

[4] As discussed above, the declarations do not specify whether the Sanctuary Series products advertised by retailers actually displayed the ATD. For this same reason, evidence regarding
(continued...)

declarants state that retailers promoted Sanctuary Series candles for at least twenty years, the record includes only three examples of such advertisements.[5]  These consist of two supermarket circulars and one black-and-white coupon, all three of which do appear to display the Asserted Trade Dress.  (Rodriguez Decl., Ex. 7.)  There is, however, no indication of where or how many copies of these advertisements were distributed, or for how long.  See Cont'l Lab. Prod., Inc. v. Medax Int'l, Inc., 114 F. Supp. 2d 992, 1001 (S.D. Cal. 2000).  Furthermore, although these advertisements do bear images of the trade dress, they can hardly be said to "feature" the ATD.  All three examples display Sanctuary Series candles alongside between one and a dozen food products.  The advertisements all identify the product only as "Religious Candles" or "Candle(s)," and none makes any mention of the "Sanctuary Series" product line.[6]  These examples, even coupled with Rodriguez's testimony that mass retailers did some kind of advertising of Sanctuary Series products, are insufficient to establish that Mercado's (or its retail customers') advertising

_____

[4](...continued)
Sanctuary Cities sales, with no distinction between products bearing the Asserted Trade Dress and other products, is of no moment.  See Rodriguez Decl., Ex. 8.

     [5] Plaintiff's Opposition does not cite to the portions of the record that include these three examples.

     [6] The black-and-white coupon, which offers a free "Candle" (in Spanish) with purchase of a food product, does identify the candle as a "Continental Candle" product.  Mercado acquired Continental Candle in 1991.  (Rodriguez Decl., ¶ 4.)

efforts effectively linked the Asserted Trade Dress with a single source.[7]

Lastly, Plaintiff argues that evidence that Defendant copied the Asserted Trade Dress creates a triable issue of fact regarding secondary meaning.  The Ninth Circuit has stated that "proof of copying strongly supports an inference of secondary meaning." Vision Sports, 888 F.2d at 615.  The cases upon which Vision Sports relied, however, specified that "[p]roof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning."  Transgo, 768 F.3d at 1016 (emphasis added).  As the Transgo court explained, under such circumstances, there would be no reason to copy other than to capitalize upon pre-existing secondary meaning.  Id.  Subsequently, however, the Ninth Circuit recognized that a party might copy trade dress for other reasons, particularly where trade dress includes functional features.  See Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 844 (9th Cir. 1987).  For that reason, evidence of even deliberate copying does not create a presumption of secondary meaning.  Id.

Here, Plaintiff does not assert that there is any evidence of exact copying.  Rather, Plaintiff points, without any citation to the record, to the "striking similarity" of the two trade dresses

---

[7] For this same reason, Rodriguez's testimony that "just because Mercado doesn't currently have copies of . . . advertising[] doesn't mean the advertising didn't occur" is of no moment.  Even assuming that some kind of advertising did occur, Rodriguez's declaration is insufficient to establish that such advertising even bore the Asserted Trade Dress, let alone featured it or effectively created an association in consumers' minds with Plaintiff.

as evidence of deliberate copying.[8]  (Opp. at 13.)  Even assuming such evidence exists, it is not sufficient to demonstrate secondary meaning.  The Vision Sports line of cases does not address trade dress claims based upon product design.  As the Continental Laboratory Products court explained, the rather circular logic that copying is evidence of secondary meaning because a copier wouldn't copy unless a trade dress had already acquired secondary meaning is less persuasive in the product design context.  Cont'l Lab. Prod., 114 F. Supp. 2d at 1009-10.  Indeed, notwithstanding Vision Sports, the Ninth Circuit has recognized that an alleged infringer might copy a trade dress for functional reasons, wholly apart from any desire to deceive consumers as to the origin of a product. Fuddruckers, 826 F.2d at 844; Cont'l Lab. Prod. 114 F. Supp. 2d at 1010.  Thus, as the Continental Laboratory Products court stated, "intentional copying supports a finding of secondary meaning only where the defendant intended to confuse consumers and pass off its product as the plaintiff's."  Cont'l. Lab. Prod., 114 F.Supp. 2d at 1010.  There is no evidence of such intent here.[9]

None of the evidence cited by Plaintiff is sufficient to establish, either directly or indirectly, that consumers associated the Asserted Trade Dress with a single source.  In the absence of

---

[8] Although Plaintiff's Opposition does, in one instance, cite to "Exhibit A," there are several such exhibits in the record.  It is unclear which of these Plaintiff intends to reference.  (Opp. at 13:27).

[9] Although Mercado does allege a trademark infringement claim related to Indio's sale of repackaged Mercado candles, that claim does not involve, nor is there evidence of, any attempts by Indio to pass off its own candles as Mercado candles by adopting similar trade dress.

evidence of secondary meaning, Plaintiff's trade dress infringement claim must fail.

C.    Functionality

Trade dress is presumed to be functional. 15 U.S.C. § 1125(a)(3); TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 30 (2001). A plaintiff alleging trade dress infringement must, therefore, prove that its claimed dress is non-functional. Clicks Billiards, 251 F.3d at 1258. "[O]rnamental, incidental, or arbitrary" trade dress is not functional. Id. A product feature is functional, however, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998). A plaintiff's burden to show non-functionality is, therefore, heavier in the product design context. Red Star Traders, LLC v. Abbyson Living Corp., No. CV 16-02781 AB (KSX), 2016 WL 9108405, at *4 (C.D. Cal. June 22, 2016) (citing Samara Bros., 529 U.S. at 212).

Plaintiff correctly observes that, as with other elements of a trade dress claim, the functionality analysis looks to the overall combination of trade dress elements rather than to individual elements. See Clicks Billiards, 251 F.3d at 1259. Functionality is a question of "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. Disc Golf Ass'n, 158

F.3d at 1006.  Plaintiff's entire functionality argument makes only a single (and general) citation to evidence of the existence of other prayer candles that do not bear the Asserted Trade Dress. (Marinelli Decl., Ex. A-7.)  The existence of such candles does, indeed, support the contention that alternative designs are available.

Plaintiff totally ignores, however, evidence pertinent to other factors.  Defendant points to evidence, submitted by Plaintiff, that one purpose of devotional candles is to "indulge" the religious figure depicted, and that because candles are "part of the church," they "must have images that are respected" so as to function as "a little altar in the house."  (Zehnder Decl., Ex. 1 at 23-24.)  Although Plaintiff now attempts to dismiss the idea that devotional candles are used to pray to the depicted religious figure as merely an "amusing assertion," other evidence in the record indicates that Plaintiff not only shared that view, but promoted its products as particularly well-suited to that purpose. (Opp. at 17:25.)  Plaintiff's interrogatory responses stated that the Asserted Trade Dress was intended to simulate "light shining through stained glass windows in cathedrals," and Plaintiff's own product information sheets explained, "When burned, Sanctuary Series simulate the effect of light shining through a stained glass window."  (Marinelli Decl., Ex. 5 at 100; Ex. 12 at 38.)  This evidence directly contradicts Plaintiff's unsupported assertion that the Asserted Trade Dress is merely suggestive, evocative, or fanciful.  (Opp. at 17:27.)

Trade dress "need only have some utilitarian advantage to be considered functional."  Disc Golf Ass'n, 158 F.3d at 1007.

Regardless whether other candle designs might also serve to invoke or honor a particular figure or function as an altar or other approximation of a church inside a home, the undisputed evidence shows that the Asserted Trade Dress is particularly well-suited to that purpose, and that Plaintiff promoted that utilitarian advantage.  Accordingly, Plaintiff cannot meet its burden to demonstrate that its Asserted Trade Dress is non-functional.[10]

D.    Trademark Infringement

Plaintiff's SAC also alleges a cause of action for trademark infringement under the Lanham Act, 25 U.S.C. § 1114.  Plaintiff alleges that Defendant passed its candles off as Mercado candles by selling Mercado candles in Indio boxes.  (SAC ¶ 35.)  In 2012, Vallarta supermarkets began to sell Indio's Eternalux candles. (Declaration of Pooya Bahktiari ¶ 55.)  Because Vallarta only wanted to sell one line of prayer candles, Indio agreed to "buy back" all of Vallarta's remaining stock of Mercado Candles.  (Id.) Indio removed loose candles from Vallarta shelves and placed them in shipping boxes.  (Id. ¶ 57.)  Indio then sold those boxes to closeout vender Vernon Sales.  (Id.)

Indio argues that Mercado's trademark rights in the candles at issue were extinguished as soon as Mercado sold the candles to Vallarta.  (Mot. at 21-22.)  Under the first sale doctrine, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product."

_____

[10] Having determined that Plaintiff cannot succeed on two of the essential elements of its trade dress claim, the court need not address Defendant's remaining arguments.

16

Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073,
1074 (9th Cir. 1995).  Although Mercado asserts that triable issues
of fact remain regarding its trademark claim, Mercado cites to no
law or facts to support that assertion or its suggestion that some
exception to the first sale doctrine applies.  It is true that in
some cases, where there is a likelihood of downstream confusion,
the first sale doctrine may not apply.  See Au-Tomotive Gold Inc.
v. Volkswagen of Am., Inc., 603 F.3d 1133, 1136-38 (9th Cir. 2010).
Here, however, there is no evidence that Vernon Sales, or anyone
else, was confused about the nature or origin of the bought-back
candles, or that any other potential exception to the first sale
doctrine would apply.  Accordingly, Defendant is entitled to
summary judgment on the trademark infringement claim.

**IV.  Conclusion**

For the reasons stated above, Defendant's Motion for Summary
Judgment is GRANTED.[11]


IT IS SO ORDERED.

Dated: July 17, 2018

DEAN D. PREGERSON
United States District Judge

---

[11] Summary judgment is also granted on Plaintiff's claims for
unfair competition and intentional interference with prospective
economic advantage.  Plaintiff appears to concede that its unfair
competition claim is predicated upon its trade dress claim  (Opp.
at 24:23-25.)  Although Plaintiff asserts that its intentional
interference claim is viable independent of the other claims,
Plaintiff does not articulate how that is the case or identify any
independent wrongful acts.